867 F.2d 318
 Gerald R. BROWN; James Menna; Gregory Plagens; and Robert
Menna, Plaintiffs-Appellants,
v.
The CITY OF TRENTON, a municipal corporation; George W.
Mans, Jr., Mayor of the City of Trenton; and William
Lilienthal, Chief of the Trenton Police Department, jointly
and severally, Defendants-Appellees.
 No. 87-1250.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 8, 1987.
Decided Feb. 9, 1989.
 
 Timothy P. Murphy (argued), Detroit, Mich., for plaintiffs-appellants.
 James I. DeGrazia, Robert G. Kamenec (argued), William B. Fitzgerald, Detroit, Mich., for defendants-appellees.
 Before: NELSON and BOGGS, Circuit Judges, and ALLEN, District Judge.*
 DAVID A. NELSON, Circuit Judge.
 
 
 1
 Reprimanded for publicly airing grievances associated with their police chief's perceived lack of support for an emergency response team of which they were members, four patrolmen employed by the City of Trenton, Michigan, sued the chief of police, the mayor, and the city under 42 U.S.C. Sec. 1983 for allegedly abridging their freedom of speech in violation of the First and Fourteenth Amendments.
 
 
 2
 The United States District Court for the Eastern District of Michigan (Richard F. Suhrheinrich, J.) found that the plaintiffs' criticisms of their chief could not fairly be characterized as "speech on a matter of public concern." See Connick v. Myers, 461 U.S. 138, 146, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983). The criticisms, in Judge Suhrheinrich's view, involved nothing more than "issues of internal police affairs which are not protected by the First Amendment in this context." The plaintiffs' lawsuits were dismissed on motion for summary judgment, and the plaintiffs have appealed. Finding ourselves in agreement with the district court's application of Connick v. Myers, we shall affirm the dismissal.
 
 
 3
 * Under date of May 29, 1985, six disgruntled patrolmen, four of whom are plaintiffs here, signed a letter to Trenton Police Chief William Lilienthal. The letter notified Chief Lilienthal of the patrolmen's desire to withdraw from the city's Emergency Response Tactical Team (ERTT), but not from the police force itself. The letter then went on to explain why the officers were, as they put it, sufficiently "fed up" to quit the team:
 
 
 4
 "What we are fed up with, is the internal strife from within our own department, the talk of current and upcoming grievances regarding the E.R.T.T. program, the inability of your office to take a firm stance against anti-E.R.T.T. complainers and the constant reminders from you about how much money we cost and the headaches you endure because of our existence in the E.R.T.T. program. Each of the above conditions can be handled by us on a separate basis, but its [sic] the culmination of them all that continually beats us down.
 
 
 5
 "Why all of a sudden, are the gripers hellbent on singling out the E.R.T.T. program? Is it jealousy, is it fear that future advancements within this department might hinge on whether or not an individual is S.W.A.T. certified, or is it fear that E.R.T.T. officers will get more than their share of overtime? Whatever the reasons, they certainly were not initiated by us. We got involved in this program because of our desire to be a part of a unit that is desperately needed in the area. For you to remind us of the financial burden and the mental stress that the E.R.T.T. program causes you, reminds us that this is your baby and you claim to have been instrumental in its inception.
 
 
 6
 * * *
 
 
 7
 * * *
 
 
 8
 "Another reason for our disgruntled attitude is your most recent decision to disregard a total E.R.T.T. activation for the Mazda Plant dedication. To coordinate a dignitary protection plan, such as the one needed for the dedication, the people responsible for the planning felt it necessary to get a commitment of approximately 50 E.R.T.T. personnel who are trained in dignitary protection. Being that the M.A.T.F. does not have that many E.R.T.T. officers, requests were made to departments outside of the M.A.T.F. for manpower. The M.A.T.F. chiefs of police adopted a separate activation policy for situations calling for S.W.A.T. certified officers. Hopefully, your second guessing of another department's request, won't have a retaliatory effect on future M.A.T.F. requests from our department.
 
 
 9
 "Your decision to send only one certified E.R.T.T. officer because of fear of union retaliation, was certainly not a take charge type decision in our minds. We were told by Lt. Elgin that you feared that officers would abuse sick time, like what was allegedly done while the last S.W.A.T. school was in session, as a means of protest. If sick time abuse is occurring, we should not be penalized by not being activated, rather you should seek out the abusers and take action.
 
 
 10
 * * *
 
 
 11
 * * *
 
 
 12
 "Even though we are requesting withdrawal from the E.R.T.T. program, we still intend to maintain our S.W.A.T. certification by attending certification sessions on our own time with no requests for compensatory time. It is possible that we may have a future administration of this department that will see the need for this unit and will staunchly support our existence regardless of the gripers. Hopefully, this future administration will not place the blame of financial woes and union problems on this program.
 
 
 13
 "Because of the above recent developments in this department, we no longer feel we can effectively and efficiently perform our duties in the E.R.T.T. program. We expect that you will want us to return the equipment (those of us that received certain equipment) you provided us. We will return the equipment bags, boot knives, mini-mag flashlights, and shoulder holsters, upon your request. You will understand, of course, that we intend to keep the hundreds of dollars of equipment that we purchased with our own money. Also, if it were possible we would give to you the inconvenience and grief that our families endured because of the long days of training and the times we were activated in barricaded gunman situations."
 
 
 14
 Carbon copies of the letter were shown as going to Mayor George Mans, the Trenton City Council, and two members of the police department of the nearby municipality of Lincoln Park.
 
 
 15
 Police Chief Lilienthal acknowledged receipt of the officers' letter and accepted their resignations from ERTT. He subsequently brought charges against the officers for violating provisions of the Trenton City Code that prohibit police officers from "publicly criticizing orders given by a superior officer" and "communicating or giving information to any person concerning the business of the police department, which is detrimental to the police department."
 
 
 16
 Only one of the officers, Patrolman Gerald R. Brown, contested the charges. Mayor Mans convened a disciplinary hearing in Patrolman Brown's case and issued findings on January 14, 1986. The mayor found that Patrolman Brown had signed and circulated the letter in question; that the letter was critical of the police chief on departmental matters; that the criticism was detrimental to the department; and that by disseminating the letter, officer Brown had violated subsections (20) and (21) of section 26-25(a) of the Trenton City Code. The mayor ordered that a letter of reprimand be placed in officer Brown's personnel file for a period of eighteen months. The mayor accepted nolo contendere pleas from the remaining five patrolmen, and letters of reprimand were placed in their personnel files for one year.
 
 
 17
 Patrolman Brown brought suit under Sec. 1983, and his action was followed by two lawsuits brought on behalf of three of the other five signatories. The cases were consolidated, and the district court ruled in favor of the defendants on cross motions for summary judgment. This appeal followed.
 
 II
 
 18
 Until the 1950s, the constitutional prohibition against abridging the freedom of speech was not generally thought to limit a municipality's power to curb the tongues of its own employees--at least where the employees wanted to remain on the payroll. "The petitioner may have a constitutional right to talk politics," as Mr. Justice Holmes put it in a widely quoted Massachusetts case, "but he has no constitutional right to be a policeman." McAuliffe v. Mayor of New Bedford, 155 Mass. 216, 220, 29 N.E. 517 (1892).
 
 
 19
 There has now been a decisive (and no doubt salutary) shift in our understanding of what the Constitution does and does not permit when it comes to limiting public comments by public servants. Although it still cannot be gainsaid, as Justice Marshall observed in Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734-1735, 20 L.Ed.2d 811 (1968), that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general," the Supreme Court has emphatically rejected "the theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable...." Id., quoting Keyishian v. Board of Regents, 385 U.S. 589, 605-06, 87 S.Ct. 675, 685, 17 L.Ed.2d 629 (1967).
 
 
 20
 Recognizing that "government offices could not function if every employment decision became a constitutional matter," Connick v. Myers, 461 U.S. at 143, 103 S.Ct. at 1688, the Supreme Court seems to have decided that it is almost never "unreasonable," in a constitutional sense, for a public body to bar comment by its employees on matters of "personal interest" to them as employees, as distinguished from matters of "public concern" on which they speak not as employees, but as citizens:
 
 
 21
 "We hold ... that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior."
 
 
 22
 Id. at 147, 103 S.Ct. at 1690.
 
 
 23
 In Rankin v. McPherson, 483 U.S. 378, ----, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315, 324 (1987), where a deputy constable who disagreed with President Reagan's views on welfare was fired for expressing the hope that the President would be killed if there were a second attempt on his life, the Court said that the "threshold question" was whether the deputy constable's comment could, in the words of Connick, be "fairly characterized as constituting speech on a matter of public concern." Rankin, as we noted in Barnes v. McDowell, 848 F.2d 725, 733 (6th Cir.1988), teaches that "[w]hether a plaintiff's speech addressed a matter of public concern is a question of law, requiring de novo review by an appellate court. If the plaintiff's speech did not address a matter of public concern," moreover, "no further inquiry is necessary." Id. (citations omitted).
 
 
 24
 In the case at bar, then, our threshold inquiry is whether the matters addressed in the officers' letter to Chief Lilienthal are matters of "public concern." As thus baldly phrased, the question is a difficult one (or perhaps an excessively easy one) to answer--for it is hard to see how any aspect of the operation of any department of any public body could be said not to constitute a legitimate subject of public concern. Connick instructs us to examine both the content and the context of the employee's statement, however, and the Court's opinion seems to suggest that if, having done so, we find that the employee's personal interest qua employee predominates over any interest he might have as a member of the general public, we are not to intercede. "[T]he First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs," 461 U.S. at 149, 103 S.Ct. at 1691, and as the Court of Appeals for the Fourth Circuit has said, quotingConnick,
 
 
 25
 "If the speech relates primarily to a matter of 'limited public interest' and does not 'seek to bring to light actual or potential wrongdoing or breach of public trust,' centering instead on matters primarily, if not exclusively 'of personal interest' to the employee such as employee grievances over internal working conditions, etc., that fact must be weighed in determining whether a matter of true public concern is involved...."
 
 
 26
 Jurgensen v. Fairfax County, 745 F.2d 868, 879 (4th Cir.1984).
 
 
 27
 With that gloss, the task facing us in the case at hand comes into better focus. Whether Chief Lilienthal's sympathies lay with the "gripers" about the ERTT program or with the program's proponents is surely a matter of limited interest to members of the general public. Whether the chief's decision to contribute only one ERTT officer to the 50-person force sought for the dedication of the Mazda plant was influenced by a fear of union retaliation would seem to fall in the same category, as would the chief's alleged reminders about how much money the team cost and how many headaches its existence caused him. The plaintiffs obviously felt aggrieved by the chief's attitude toward the team, but their grievances were essentially those of in-house people dissatisfied with the chief's leadership of their group. There is no hint in this case of any actual or potential wrongdoing or any breach of public trust, and for us to say that the subject of the officers' letter was a matter of "public concern" within the specialized meaning of that phrase as used in Connick would be to say that Connick has no real meaning at all. See Murray v. Gardner, 741 F.2d 434, 438 (D.C.Cir.1984), cert. denied, 470 U.S. 1050, 105 S.Ct. 1748, 84 L.Ed.2d 813 (1985).
 
 
 28
 Connick compels the conclusion that the letter in question did not deal with matters of public concern, and that conclusion obviates any need for further "balancing" between the interest of the police officers in speaking out and the interest of the city in maintaining discipline and decorum in the ranks of its police force. If such balancing were required, moreover, the importance of deference to the city's judgment on the matter of discouraging public dissension within its safety forces would tip the scales decisively in favor of the defendants. See McMurphy v. City of Flushing, 802 F.2d 191 (6th Cir.1986). Cf. Kelley v. Johnson, 425 U.S. 238, 245-46, 96 S.Ct. 1440, 1444-1445, 47 L.Ed.2d 708 (1976) (deference is due local government's choice of police force structure emphasizing need for discipline and esprit de corps), and Kannisto v. San Francisco, 541 F.2d 841, 844 (9th Cir.1976) (police department regulations entitled to "considerable deference" because of substantial interest in maintenance of efficient organization to carry out important law enforcement duties), cert. denied, 430 U.S. 931, 97 S.Ct. 1552, 51 L.Ed.2d 775 (1977).
 
 
 29
 Although some courts might strike the balance differently (see, e.g., United States v. Inmon, 568 F.2d 326 (3rd Cir.1977), and Muller v. Conlisk, 429 F.2d 901 (7th Cir.1970)), the potentially disruptive effect of comments such as the plaintiffs' on working relationships within the police force seems obvious to us. It would be absurd to suppose that such comments were not "reasonably calculated to create division or to have impaired discipline." Patkus v. Sangamon-Cass Consortium, 769 F.2d 1251, 1258 (7th Cir.1985) (quoting Yoggerst v. Stewart, 623 F.2d 35, 40 (7th Cir.1980)). "[W]here an officer's speech-related activity has the effect of materially disrupting his working environment, such activity is not immunized by constitutional guarantees of freedom of speech." Hughes v. Whitmer, 714 F.2d 1407, 1422 (8th Cir.1983), cert. denied, 465 U.S. 1023, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984).
 
 
 30
 It is one thing for police officers to take a dim view of their boss privately, and quite another thing for them to suggest publicly that they are looking forward to his administration being replaced by one with different priorities. The police chief was not required to "tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships," Connick, 461 U.S. at 154, 103 S.Ct. at 1964, and "[w]hen employee speech concerning office policy arises from an employment dispute concerning the very application of that policy to the speaker, additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run the office." Id. at 153, 103 S.Ct. at 1693. The disciplinary action visited upon the plaintiffs here as a result of their indiscretion seems to have been a relatively mild one, and we feel quite safe in suggesting that there has never been a time in the history of the Republic when the United States Supreme Court would have considered the issuance of letters of reprimand under circumstances of this sort to be constitutionally impermissible.
 
 III
 
 31
 The plaintiffs also contend that the subsections of the municipal code under which they were reprimanded are "overbroad" and thus unconstitutional on their face. Even assuming that the reprimands would have been proper under a more tightly drawn code, in other words, the plaintiffs contend that they were unconstitutional under this particular code. We are not persuaded.
 
 
 32
 Section 26-25(a) of the Trenton City Code lists thirty-three offenses for which police officers may be disciplined. Among them are "[c]owardice," "[g]eneral incompetency," "[c]onduct unbecoming an officer," "[u]sing coarse, profane or insolent language ... to any citizen," and "[i]mmorality." A member of the police department found guilty of any of the listed offenses is subject to "reprimand, suspension, forfeiture of pay, dismissal or ... such other lawful punishment as the chief of police may direct." The particular offenses for which the plaintiffs were disciplined were those described in subsection (20), "[p]ublicly criticising [sic] orders given by a superior officer", and (21), "[c]ommunicating or giving information to any person concerning the business of the police department, which is detrimental to the police department."
 
 
 33
 The "overbreadth" doctrine on which the plaintiffs rely was summarized thus in Board of Airport Commissioners v. Jews for Jesus, Inc., 482 U.S. 569, ----, 107 S.Ct. 2568, 2571-72, 96 L.Ed.2d 500, 507 (1987):
 
 
 34
 "Under the First Amendment overbreadth doctrine, an individual whose own speech or conduct may be prohibited is permitted to challenge a statute on its face 'because it also threatens others not before the court--those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid.' A statute may be invalidated on its face, however, only if the overbreadth is 'substantial.' The requirement that the overbreadth be substantial arose from our recognition that application of the overbreadth doctrine is, 'manifestly, strong medicine,' and that 'there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds.' " (Citations omitted.)
 
 
 35
 New York v. Ferber, 458 U.S. 747, 771, 102 S.Ct. 3348, 3362, 73 L.Ed.2d 1113 (1982), teaches that "[a] law should not be invalidated for overbreadth unless it reaches a substantial number of impermissible applications." The Supreme Court has described "substantial overbreadth" as
 
 
 36
 "a criterion the Court has invoked to avoid striking down a statute on its face simply because of the possibility that it might be applied in an unconstitutional manner. It is appropriate in cases where, despite some possibly impermissible application, the ' "remainder of the statute ... covers a whole range of easily identifiable and constitutionally proscribable ... conduct...." ' "
 
 
 37
 Secretary of Maryland v. Joseph H. Munson Co., 467 U.S. 947, 964-65, 104 S.Ct. 2839, 2851, 81 L.Ed.2d 786 (1984).
 
 
 38
 As far as the provisions of the city code at issue here are concerned, anyone with an active imagination can readily dream up hypothetical situations in which corrupt or unscrupulous or unbalanced officials might apply the code in an unconstitutional manner. A madman in high office could give standing orders that any person apprehended in the commission of a crime be shot on sight, for example, and a patrolman who publicly criticized the order could theoretically be disciplined for his pains under subsection 20. But for federal courts to strike down municipal ordinances that have not in fact been misapplied in any way would, as the Supreme Court has said, be "strong medicine," and we have been cautioned against presuming to administer that medicine in the absence of a "realistic" danger that the mere existence of the ordinance will significantly compromise recognized First Amendment protections of parties not before the court. No such realistic danger exists here.
 
 
 39
 To devise a detailed code of police conduct incapable of misapplication would be utterly impossible, or so we should find it, but that does not mean that the Constitution bars codes of police conduct generally. Most chiefs of police are neither corrupt nor mad, and while any police chief can make a mistake, just as any of the rest of us can, courts are fully capable of correcting such mistakes. If Chief Lilienthal had disciplined Officer Brown for publicly exposing corruption in the City of Trenton police force, for example, or for publicly criticizing unconstitutional orders, we have no doubt that Judge Suhrheinrich, upon request, would have taken appropriate action--and if he had not, we would have.
 
 
 40
 Courts of law do a pretty good job, if we may say so, of deciding actual cases that have actually come before them; when they undertake to decide cases that have not yet arisen, however, courts may be more likely to lose their way--which is doubtless one reason for the familiar rules designed to discourage unnecessary judicial determinations. See generally New York v. Ferber, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982); Broadrick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); United States v. Raines, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960); and Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953). Law that deals with observed facts tends to be sounder than law created to serve untested theories. Notwithstanding the weighty policies underlying the First Amendment overbreadth doctrine, on this record it seems to us that the theoretical risk that the Trenton City Code might be misused in the future is far less significant than the fact that it was not misused in the case before us. There has been no showing of any likelihood of substantial misuse of the code, and no showing that the code's mere existence is calculated to discourage the exercise of any constitutional right. For us to take it upon ourselves to set the code aside would, we believe, be a serious misuse of the judicial power.
 
 IV
 
 41
 Finally, we address the plaintiffs' contention that the code provisions are unconstitutionally vague. A "statute is void for 'vagueness' " if it "is a statute 'which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.' " Zwickler v. Koota, 389 U.S. 241, 249, 88 S.Ct. 391, 396, 19 L.Ed.2d 444 (1977) (quoting Connally v. General Constr. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926)). And, "where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts." Smith v. Goguen, 415 U.S. 566, 573, 94 S.Ct. 1242, 1247, 39 L.Ed.2d 605 (1974).
 
 
 42
 Applying these standards, we conclude that the challenged regulations provide adequate notice of what is proscribed. We doubt that there was any "question in the minds of the plaintiffs who brought this lawsuit as to the meaning of the law, or as to whether or not the conduct in which they desire[d] to engage was or was not prohibited" by the city code. See Civil Service Comm'n v. National Assn. of Letter Carriers, 413 U.S. 548, 579, 93 S.Ct. 2880, 2897, 37 L.Ed.2d 796 (1973). The draftsman of the offending letter seems to have had no trouble expressing himself clearly and forcefully, and if the comments on Chief Lilienthal's decision to order only one ERTT officer to attend the Mazda plant dedication were not intended to signify that the officers were "criticizing" the order, we seriously misjudge the degree of literary skill reflected in the letter.
 
 
 43
 Justice Blackmun warned some years ago, in a case involving a regulation of speech by the general public, that the overbreadth and vagueness doctrines can easily become "result-oriented." And the more frequently these doctrines are invoked, he said, "the more we usurp the prerogative of democratic government. Instead of applying constitutional limitations, we ... become a 'council of revision.' " Lewis v. New Orleans, 415 U.S. 130, 140, 94 S.Ct. 970, 976, 39 L.Ed.2d 214 (1974) (Blackmun, J., dissenting.) No one elected Judge Suhrheinrich to rewrite the provisions of Trenton City Code governing the conduct of the city's police officers, and in the absence of any showing that the code's existence posed real-world problems of constitutional magnitude, we think he was right to leave it alone.
 
 
 44
 The summary judgment in favor of the defendants is AFFIRMED.
 
 
 
 *
 The Honorable Charles M. Allen, United States District Judge for the Western District of Kentucky, sitting by designation