66 F.3d 327
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Brian YINGER, Plaintiff-Appellant,
v.
CITY OF DEARBORN, et al., Defendants-Appellees.
 No. 94-1225.
 United States Court of Appeals, Sixth Circuit.
 Sept. 19, 1995.
 
 Before: JONES and RYAN, Circuit Judges; and MATIA, District Judge.*
 PER CURIAM.
 
 
 1
 Appellant Brian Yinger appeals, on federal and state constitutional free speech and due process grounds, the district court's grant of summary judgment in favor of defendants, City of Dearborn and Police Chief Ronald Deziel, in this action challenging the defendants' adverse employment decisions. On appeal, we are asked to decide (1) whether Yinger's discipline, lowered promotional score and forced medical leave without pay constitute retaliation for the exercise of his free speech rights, (2) whether Yinger's speech was a substantial and motivating factor leading to the imposition of an unpaid medical leave, (3) whether the defendants violated Yinger's substantive due process rights by placing him on unpaid medical leave, (4) whether Chief Deziel was entitled to qualified immunity on the First Amendment claim, (5) whether the city of Dearborn is liable under the Michigan Constitution for Yinger's free speech and due process claims and (6) whether the district court properly ruled that Yinger was not wrongfully discharged. For the reasons that follow, we affirm the district court's grant of summary judgment in defendants' favor.
 
 I.
 
 2
 Corporal Yinger began his employment with the City of Dearborn Police Department in 1977. In his sixteen-year career with the Police Department, Yinger was reprimanded on at least twelve occasions. The particular incident leading to the commencement of this lawsuit concerned Yinger's September, 1992 reprimand for the use of the international "7" in his handwritten reports.
 
 
 3
 The record shows that as early as 1983, Yinger was ordered to cease using the international "7" by a superior officer. Yinger failed to follow the order over the years, whether through inadvertence or intent, and apparently failed to follow the same order in 1992. A trial board hearing followed, at which time Chief Deziel found Yinger guilty of insubordination, imposed a three-day suspension without pay and ordered Yinger to be evaluated by an Employee Assistance Plan provider within ten days for fitness for duty. It is undisputed that the disciplinary action Yinger received generated a tremendous amount of media attention.
 
 
 4
 The basis for the suspension and referral is disputed. According to Yinger, the manner in which he wrote the number "7" was only a pretext for the real reason. Yinger alleges that he was the victim of retaliation for being suspected of informing the Detroit Free Press of a ten-month coverup by defendants of the drunk driving arrest of a Dearborn police inspector. However, it is Yinger's position that he never informed the press of the coverup, and it is the defendants' position that Chief Deziel never suspected him of informing the press. According to defendants, Yinger was referred to a psychologist because, inter alia, he had been the subject of more disciplinary action in eight years than any other officer on the force with up to twenty-five years of experience.
 
 
 5
 In accordance with the trial board judgment, Yinger submitted to an evaluation by psychologist Mary Ann Hamlin, Ph.D., who found Yinger fit for duty. Yinger was reimbursed for the three days of lost pay after the union filed a grievance on his behalf in the matter.
 
 
 6
 On May 13, 1993, Yinger appeared at a Civil Service Commission meeting to object to a performance evaluation score. Both Chief Deziel and the City of Dearborn Personnel Director became concerned about Yinger's behavior at the meeting and thus ordered Yinger to see Dr. Hamlin once again for an evaluation of his fitness for duty. Dr. Hamlin concluded that Yinger was not fit for duty.
 
 
 7
 The parties wanted a second opinion regarding Yinger's mental status. Union representatives recommended two doctors to Yinger for this evaluation, from which he selected Dr. Panyard. On June 4, 1993, Yinger was placed on leave with pay and benefits pending the examination by Dr. Panyard. In a report dated June 22, 1993, Dr. Panyard concluded that Yinger was not fit for duty. In response to this report, Yinger was placed on a sixty-day medical leave, with the proviso that he receive counseling from a qualified approved professional and furnish a report to defendants every thirty days. He has failed to do so, and remains on medical leave to this day.
 
 
 8
 During his leave, Yinger hired Doctor Abramsky to provide an opinion as to his mental status. Dr. Abramsky concluded that he saw no evidence that Yinger was not fit for duty. The defendants, in possession of three psychological reports, two finding Yinger unfit and one finding him fit, suggested that the matter be resolved by either Dr. Hamlin, Dr. Panyard or a third doctor to be agreed upon by Drs. Hamlin and Abramsky or appointed by the Court. The parties ultimately agreed on a doctor to perform the evaluation, which doctor found Yinger fit for duty. However, the information which Yinger provided to the doctor was incomplete regarding his military background. Consequently, the doctor stated that he was willing to reevaluate Yinger in light of Yinger's complete background, once Yinger provided verification of his military experience. To date, Yinger has produced nothing and remains on leave--with the ability to return to duty once he complies with the aforementioned requirements and is found fit for duty.
 
 II.
 
 9
 Review of a grant of summary judgment is de novo, using the same test utilized by the district court in determining whether summary judgment is appropriate. Deaton v. Montgomery County, Ohio, 989 F.2d 885, 887 (6th Cir.1993). Summary judgment is proper only if, after viewing the evidence in a light most favorable to the nonmovant, we find that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); White's Landing Fisheries, Inc. v. Buchholzer, 29 F.3d 229, 231 (6th Cir.1994).
 
 
 10
 Yinger's primary complaint is that the defendants violated his federal and state constitutional rights to speak freely on matters of public concern. It is clearly established that a public employer may not take adverse employment action against an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech. Williams v. Commonwealth of Kentucky, 24 F.3d 1526, 1534 (6th Cir.1994) citing Rankin v. McPherson, 483 U.S. 378, 383, 107 S.Ct. 2891, 1896, 97 L.Ed.2d 315 (1987).
 
 
 11
 Claims of retaliation for engaging in conduct protected by the First Amendment are evaluated pursuant to a multi-part test. Roberts v. Van Buren Public Schools, 773 F.2d 949, 953 (8th Cir.1985). First, the plaintiff must demonstrate that his speech was protected. Second, he must demonstrate that the protected speech was a substantial or motivating factor in the adverse employment decision. Third, the defendant employer will prevail if it can show that the employment action would have been taken even in the absence of the protected speech. Id. at 953-954, citing Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); see also Thompson v. McDowell, 661 F.Supp. 498, 499-500 (E.D.Ky.1987).
 
 
 12
 Identification of protected speech is a two-step process in itself.
 
 
 13
 As a threshold matter, the speech must have addressed a "matter of public concern," (citations omitted); then, the interest of the employee in so speaking must be balanced against "the interest of the State, as an employer, in promoting the efficiency of the public service it performs through its employees." Pickering, 391 U.S. at 568, 88 S.Ct. at 1735. This "Pickering balance," as it has come to be known, looks to the following factors:
 
 
 14
 (1) the need for harmony in the office or work place; (2) whether the government's responsibilities require a close working relationship to exist between the plaintiff and co-workers when the speech in question has caused or could cause the relationship to deteriorate; (3) the time, manner, and place of speech; (4) the context in which the dispute arose; (5) the degree of public interest in the speech; and (6) whether the speech impeded the employee's ability to perform his or her duties. (citation omitted)
 
 
 15
 Roberts, 773 F.2d at 954.
 
 
 16
 The threshold inquiry, whether the speech at issue addresses a matter of public concern, is a question of law. Williams, 24 F.3d at 1534; Brown v. City of Trenton, 867 F.2d 318, 321 (6th Cir.1989). If we find that the plaintiff's speech does not address a matter of public concern, no further inquiry is necessary. Brown, 867 F.2d at 321. If, on the other hand, we find that the plaintiff's speech does address a matter of legitimate public concern, then we must determine if the plaintiff's interest in speaking freely is outweighed by the state's interest in promoting the efficiency of its public services. Williams, 24 F.3d at 321 citing Rankin, 483 U.S. at 388.
 
 
 17
 In determining whether a plaintiff's speech relates to matters of public concern, we must examine both the content and context of the employee's speech. Connick v. Meyers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). If we find that "the employee's personal interest qua employee predominates over any interest he might have as a member of the general public," we must find that the speech is not protected. Brown, 867 F.2d at 322.
 
 
 18
 One of the significant factors to be initially considered in deciding whether the "speech" relates to "a matter of public concern" is the subject-matter of the speech or action. If the speech relates primarily to a matter of "limited public interest" and does not "seek to bring to light actual or potential wrongdoing or breach of public trust," centering instead on matters primarily, if not exclusively "of personal interest" to the employee such as employee grievances over internal working conditions, etc., that fact must be weighed in determining whether a matter of true public concern is involved for the "First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs." Connick, 103 S.Ct. at 1691. Where personal or employee grievances are more the subject-matter of the speech than matters of public interest it is the rule that "a wide degree of deference to the employer's judgment is appropriate. Id. 103 S.Ct. at 1692. (footnote omitted)
 
 
 19
 Jurgensen v. Fairfax County, 745 F.2d 868, 879 (4th Cir.1984).
 
 
 20
 In order to determine whether Yinger's speech addressed a matter of public concern, we must look to the particular statements Yinger claims are protected. This basic question is not easily answered by reviewing the record, and was not clarified, after repeated questioning, at the time of oral argument.
 
 
 21
 Yinger's first assignment of error reads as follows:
 
 
 22
 Did plaintiff's discipline, lowered promotional potential score, and forced medical leave without pay for so-called "insubordination" in unintentionally failing to completely obey an order to stop crossing his 7s, a habit that was ignored for nine years until after the media revealed a ten-month cover-up of a drunk driving arrest of Dearborn Police Inspector John Sligay, and until after world-wide publicity appeared on the punishment for writing 7s, and an irrational order from Defendant Chief of Police Deziel, who has been hospitalized for admitted alcohol abuse, constitute retaliation for plaintiff's speech on a matter of public concern and was plaintiff's speech protected by the First Amendment?
 
 
 23
 Plaintiff-Appellant's Brief on Appeal ("Plaintiff-Appellant's Brief"), at 1. It is unclear whether the speech Yinger claims is protected is the use of the international 7 in his daily reports, his response to media inquiries regarding his discipline over use of the international 7, or suspicions that he informed the Detroit Free Press about an alleged cover-up of a Dearborn police inspector's drunk driving arrest.
 
 
 24
 Clearly, the defendants' demands with regard to the manner in which police reports are written is a matter of internal office policy which is of no public interest at all. In the hearing on Defendants' Motion for Summary Judgment, plaintiff's counsel argued, "It is a matter of public concern if the defendant acts irrationally with respect to his crossing his sevens. That becomes a matter of public concern to the citizens of Dearborn, how their police department is reacting." Joint Appendix, Volume III, p. 597. We disagree.
 
 
 25
 Whether a public employer insists that its employees use green pens rather than black pens, staple their reports on the middle at the top of the page rather than at the left side, or discontinue use of the international 7 because other employees are confusing it with a "Z", is strictly a matter of office policy regardless of the skepticism with which it may be viewed by the employee, the media or this Court. Yinger's comments to the press regarding discipline for failure to follow that policy does not change an inherently internal office matter into one of public concern. "Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government; this does not require a grant of immunity for employee grievances not afforded by the First Amendment to those who do not work for the State." Connick, 461 U.S. at 147.
 
 
 26
 Yinger also argues that the amount of interest generated by the media over this incident automatically transformed it into a matter of public concern.[1] To support his argument that public interest is synonymous with public concern, Yinger cites Roberts v. Van Buren Schools, 773 F.2d 949 (8th Cir.1985). This argument lacks merit. A plain reading of Roberts, quoted infra at 4-5, shows that the Pickering balance occurs only after the court has determined as a matter of law whether the speech at issue is protected, i.e., whether it addresses a matter of public concern.
 
 
 27
 In further support of his argument that public interest equals public concern, Yinger cites Roberts, Lewis, Patkus v. Sangamon-Cass Consortium, 769 F.2d 1251 (7th Cir.1985), Joyner v. Lancaster, 815 F.2d 20 (4th Cir.1987), Eiland v. City of Montgomery, 797 F.2d 953 (11th Cir.1986), and Zamboni v. Stamler, 847 F.2d 73 (3d Cir.1988). These cases, however, support our decision today.
 
 
 28
 In Roberts, the court found that two teachers' written grievance expressing dissatisfaction with the manner in which parental complaints concerning seating arrangements for the bus on a field trip were handled was of limited public interest and, therefore, not protected. In contrast, grievances involving allocations of public funds were considered a matter of public concern.
 
 
 29
 In Patkus, the court found that a public administrator's letter to the Department of Labor questioning the propriety of an investigation and challenging its comportment with federal regulations was a matter of public concern. On the other hand, the court found that the same administrator's charge that the County was undermining her authority, and references to the investigation as a "witch hunt" and the internal problems as a "political battle" were not matters of public concern.
 
 
 30
 In Joyner, the court found that a police captain's support of a non-incumbent running for sheriff to be partly protected but primarily a matter of personal interest in his own job advancement.
 
 
 31
 In Lewis, the court found that a county magistrate's expression of opposition, through the proper channels, to the clerk of court's directive that all magistrates begin microfilming small claims documents was protected speech.
 
 
 32
 In Eiland, the court found a police officer's poem criticizing the mayor three days prior to an election was protected speech because it went directly to the heart of the democratic electoral process.
 
 
 33
 In Zamboni, the court found that a detective's criticisms of a prosecutor's reorganization plan as violative of the civil service laws were protected speech.
 
 
 34
 We agree with the findings regarding the status of the speech at issue in the aforementioned cases, and find, as the courts did in Roberts, Patkus and Joyner, that Yinger's speech centered primarily on matters of personal interest to him as an employee. Indeed, Yinger's statements to the media concerning the disciplinary action taken against him for writing the international "7" appear to be little more than an example of "the quintessential employee beef: [that] management has acted incompetently." Barnes v. McDowell, 848 F.2d 725 (6th Cir.1988) quoting Murray v. Gardner, 741 F.2d 434, 438 (D.C.Cir.1984), cert. denied, 470 U.S. 1050, 105 S.Ct. 1748, 84 L.Ed.2d 813 (1985).
 
 
 35
 Yinger insinuates that although he was disciplined for "so-called 'insubordination' in unintentionally failing to completely obey an order to stop crossing his 7s," he was in fact disciplined for being suspected of revealing to the media information regarding the alleged ten-month coverup of the drunk driving arrest of a Dearborn police inspector. However, it is undisputed that Yinger never informed the press of the coverup, and that Chief Deziel never suspected him of informing the press. Consequently, although this is the type of speech that may find protection within the First Amendment, Yinger cannot recover for infringement of his right to speak freely on this matter, because he never exercised that right.
 
 
 36
 Finally, Yinger contends that his statements to the media regarding his discipline, if found not to be protected in and of themselves, were automatically elevated to the level of protected speech if the media initiated contact with him. In support, he cites Rahn v. Drake Center, Inc., Nos. 92-4041; 93-3170 (6th Cir. Aug. 8, 1994) and Matulin v. City of Lodi, 862 F.2d 609 (6th Cir.1988). However, Rahn supports the defendants' position, and Matulin is distinguishable.
 
 
 37
 In Rahn, a disgruntled hospital employee issued a press release and was interviewed by a local television station complaining about the administration of the hospital and the way tax monies were being spent. The Sixth Circuit vacated a judgment entered by the lower court in favor of plaintiff on a First Amendment claim, stating, inter alia, that neither media attention nor the source of that attention alone converts unprotected speech into speech addressing a matter of public concern.[2]
 
 
 38
 Matulin involved a public employee's statements to the press regarding allegations of gender and handicap discrimination by a public employer. The Matulin court found, as did the Third Circuit in Rode v. Dellaciprete, 845 F.2d 1195 (3d Cir.1988), that statements relating to charges of discrimination leveled at public employers and reported upon by newspapers clearly involve matters of public concern. Matulin, 862 F.2d at 613. The Court noted that its finding that Matulin's speech addressed a matter of public concern was strengthened by the fact that Matulin did not initiate media contact but was, instead, approached by the media. Neither Rahn nor Matulin bolsters Yinger's argument that his statements to the press regarding his discipline over the way he wrote the number "7", essentially an employee grievance over an internal office matter, are entitled to First Amendment protection simply because the media initiated contact with him.
 
 
 39
 Because we find that Yinger's speech did not address matters of public concern, it follows that his speech is not protected by the First Amendment as a matter of law. Thus, it is unnecessary for this Court to engage in the Pickering balancing test. If such balancing were required, however, we would find that the importance of "deference to the city's judgment on the matter of discouraging public dissension within its safety forces would tip the scales decisively in favor of defendants." Brown, 867 F.2d at 322. In the instant case, the controversy itself concerned disciplinary action taken by Chief Deziel, a supervisor Yinger had to deal with on a regular basis. It is undisputed that Chief Deziel fielded a significant number of telephone calls regarding the incident, that the department received at least one hundred letters regarding the insubordination charge, and that all number 7's in the department (on memos and police cars) were crossed after the trial board hearing.
 
 
 40
 Because of our ruling that Yinger's speech is not "protected" for First Amendment purposes, we need not address the issues of whether the adverse employment action taken against Yinger was in retaliation for the exercise of his free speech rights, whether Yinger's speech was a substantial and motivating factor leading to his being forced on medical leave, whether a wrongful discharge claim may lie on the basis of retaliation for Yinger's exercise of protected speech, and whether Deziel was entitled to qualified immunity with respect to Yinger's First Amendment claim. The only remaining issues are whether defendants violated Yinger's substantive due process rights under the Fourteenth Amendment and whether his wrongful discharge claim should have been dismissed.
 
 III.
 
 41
 Yinger claims that his forced medical leave without pay violates the substantive due process clause of the Constitution. The test for substantive due process claims is whether the defendants' conduct "shocks the conscience". Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.E. 183 (1952). It has already been determined by this Court that the termination of public employment does not "shock the conscience", i.e., constitute a denial of substantive due process, where the property right that is infringed is a state-created right to employment, as opposed to a fundamental right created by the Constitution. Sutton v. Cleveland Bd. of Educ., 958 F.2d 1339, 1351 (6th Cir.1992) ("Absent the infringement of some 'fundamental' right, it would appear that the termination of public employment does not constitute a denial of substantive due process."); Holthaus v. Board of Educ., 986 F.2d 1044 (6th Cir.1993); McMaster v. Cabinet For Human Resources, 824 F.2d 518, 523 (6th Cir.1987); see also Pesek v. City of Brunswick, 794 F.Supp. 768, 777 (N.D.Ohio 1992).
 
 
 42
 We have determined today that Yinger's fundamental constitutional right to speak freely on matters of public concern was not infringed. Additionally, Yinger has been put on medical leave with the option of returning to work once he obtains a fitness report from a mutually chosen doctor. Certainly, this leave status is less severe than an actual termination of employment, and is partly within Yinger's control. For these reasons, we conclude that Yinger's medical leave does not violate substantive due process.
 
 IV.
 
 43
 With respect to Yinger's state constitutional claims, the due process analysis in Michigan is the same as it is in the federal system. See, e.g., Edmond v. Department of Corrections, 373 N.W.2d 168, 171 (Mich.App.1985); Donahoo v. Household Fin. Corp., 472 F.Supp. 353, 354-355 (E.D.Mich.1979). Furthermore, the free speech analysis in Michigan is the same as it is in the federal system. See Advisory Opinion on Constitutionality of 1975 PA 227, 242 N.W.2d 3, 9 (1976); Book Tower Garage v. International Union U.A.W.A., 295 N.W. 320 (1940). Because Yinger's free speech and due process claims fail under the First and Fourteenth Amendment analyses, the state constitutional claims also fail.
 
 V.
 
 44
 With respect to the wrongful discharge claim, the record reflects that Yinger has not been discharged and, even now, will be returned to duty if he is able to obtain the neutral report of an agreed-upon mental health professional stating that Yinger is fit for duty. Consequently, we find that the lower court was correct in granting judgment in favor of defendants on the wrongful discharge claim.
 
 VI.
 
 45
 In light of the foregoing, we AFFIRM the lower court's grant of summary judgment in defendants' favor.
 
 
 
 *
 The Honorable Paul R. Matia, United States District Judge for the Northern District of Ohio, sitting by designation
 
 
 [1]
 "Even if, for the sake of argument, the issue started out as a matter of personal concern, it became a matter of public concern when the public found out that plaintiff was disciplined for crossing his 7s." Plaintiff-Appellant's Brief, at 35
 
 
 [2]
 The Sixth Circuit also noted that a public employee's comments regarding the expenditure of public funds does not of itself qualify that speech as protected