NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0785n.06
Filed: December 24, 2008

No. 07-6484

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

MIKE FITZPATRICK,

    Plaintiff-Appellant,

       v.

CITY OF FRANKFORT, KENTUCKY; WALLACE
POSSICH, Individually and in his official capacity as
City of Frankfort Fire Chief,

    Defendants-Appellees.

On Appeal from the United
States District Court for the
Eastern District of Kentucky
at Frankfort

_____/

**Before:**     **GUY and GRIFFIN, Circuit Judges; and WATSON, District Judge.**[*]

    **RALPH B. GUY, Jr., Circuit Judge.**     Plaintiff Mike Fitzpatrick appeals from the

entry of summary judgment in favor of defendants, the City of Frankfort, Kentucky, and its

Fire Chief Wallace Possich, on plaintiff's claim of retaliation in violation of his First

Amendment rights. 42 U.S.C. § 1983.[1] Plaintiff argues that it was error to conclude that he

could not state a claim under *Pickering*'s two-part test for First Amendment retaliation claims

---

[*]The Honorable Michael H. Watson, United States District Judge for the Southern District of Ohio,
sitting by designation.

[1]Plaintiff does not separately challenge the decision to decline to exercise supplemental jurisdiction
over his state law claims for constructive discharge, outrageous conduct, and punitive damages.

by public employees. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); *Connick v. Myers*, 461 U.S. 138, 149-55 (1983). The district court found that although plaintiff engaged in at least some protected activity, his interests were outweighed by the defendants' interests in promoting the efficiency of the public services provided by fire department employees. After review of the record and the applicable law, we affirm.

**I.**

Mike Fitzpatrick was employed from July 1989 until May 31, 2006, as a firefighter and EMT/paramedic with the Frankfort Fire Department. Plaintiff helped organize the Firefighter's Local 1017 in 1997, although the union is not recognized by the City for collective bargaining purposes. Plaintiff served as union president from 1997 until 2000. Wallace Possich was appointed Fire Chief with the support of the union in 1998.

Plaintiff described himself as a "strong and vocal advocate of the civil service system, a vocal and active participant in the union, and a proponent of issues related to firefighter safety and job security." The district court more pointedly characterized this action as "the unfortunate culmination of a very difficult working relationship." Summarizing, the district court explained that:

> From 1996 on, Fitzpatrick brought numerous complaints to the Fire Department's attention challenging department policies and personnel matters, raising allegations of discrimination and preferential treatment of department employees, critiquing the department's treatment of the firefighter's union, and advocating for greater inclusion of the civil service system in the department hierarchy. These complaints were variously brought through official written grievances, problem resolution forms, and letters to officials of the Fire Department and the City of Frankfort, as well as through statements during department and union meetings.

The district court also observed that Fitzpatrick's employment record revealed "a generally antagonistic and uncooperative attitude towards his superiors and department policies, and that this attitude [was] exhibited throughout his tenure at the Fire Department."

Among the many complaints were: plaintiff's objections to his being required to do additional training in 1996; his grievance about the decision to eliminate age-based differences in physical agility standards in 1996; and his questioning of changes to the fitness test and job description in 1997. In 1998, plaintiff initiated a complaint alleging abusive conduct by Lt. Larry Tucker against another firefighter and the failure of the chain of command to act. Chief Possich's investigation concluded, among other things, that plaintiff's complaints were unfounded and not based upon personal knowledge. Possich added that plaintiff had "demonstrated an uncooperative and antagonistic attitude during a meeting to attempt to resolve this issue." Plaintiff also persisted in complaints regarding the decision to exempt two "grandfathered" firefighters from ambulance "ride time" hours. Fitzpatrick takes credit for the subsequent change in that policy, as well as for the fact that those firefighters later became certified EMTs. None of these complaints, however, were identified as protected speech or as motivation for the alleged retaliation.

Rather, plaintiff argues that he engaged in protected speech in challenging the decisions concerning the positions of EMS Director, EMS Shift Supervisor, Emergency Preparedness Coordinator, and Assistant Fire Chief over the course of several years preceding his retirement. The district court concluded that, at least with respect to the proposal to remove the Assistant Fire Chief position from the civil service, plaintiff's speech

touched on matters of public concern. As is discussed later, the district court also assumed for purposes of summary judgment that plaintiff's speech concerning the duties of the Emergency Preparedness Coordinator, a position created outside the civil service, addressed matters of public concern. Defendants do not challenge the district court's conclusions or assumptions in this regard, nor does plaintiff appeal from the determination that much of the speech involved internal personnel disputes that did not touch on matters of public concern.

Three specific instances of alleged retaliation were identified by plaintiff: an oral reprimand in July 2005; a change in supervisors in November 2005; and a written reprimand in May 2006. Apart from these actions, plaintiff was also disciplined for falling behind in the required "ride time" hours during the summer of 2005. In September 2005, the matter was resolved by allowing plaintiff to drop from primary to secondary paramedic status without having to make up the missed "ride time" or return the premium pay he had collected. This discipline, however, was not alleged to have been retaliatory.[2]

The first incident of alleged retaliation occurred in July 2005, when Possich called plaintiff into the fire station's kitchen, asked plaintiff what his "problem" was with Deron Rambo, and threatened to charge him with insubordination when plaintiff claimed ignorance. It was later revealed that another employee had made the inquiry about Rambo that prompted this exchange, and the matter was dropped. Still, the district court noted that plaintiff

---

[2]This resulted in a complaint by another firefighter, who characterized plaintiff's shortfall in hours as a result of a failure of supervision, accused Possich of giving plaintiff preferential treatment, and complained that this resolution further undermined already poor morale. Possich acknowledged these concerns as legitimate, but stood by the determination that it was best if plaintiff no longer worked as a primary paramedic.

claimed to have been repeatedly scolded and verbally reprimanded for questioning Rambo's appointment as Emergency Preparedness Coordinator.

The second allegedly retaliatory act was the decision in November 2005 to change the supervisor on plaintiff's crew while plaintiff and a few other firefighters were away helping with Hurricane Katrina relief. The decision to transfer plaintiff's supervisor, Lt. Ray Travis, to an open vacancy on another crew was allegedly made over Travis's objections and contrary to the department's past practice of assigning a newly promoted supervisor to the existing vacancy. Plaintiff was told that the newly promoted Lt. Ben Boggs announced on his first day that he had been "sent down here to straighten Mike Fitzpatrick out . . . [with] the blessing of the Chief." Boggs denied making this statement, while Possich testified that the transfer decision was jointly made based on the recommendation that Boggs would be "best at Station 2." Someone else allegedly told Battalion Chief John Unger, who was one of the decisionmakers, that Boggs and Fitzpatrick did not get along, and Unger allegedly responded, "I know, it's great, it won't last a day." Unger denied making that statement, however. Recognizing that the facts were disputed, the district court viewed the evidence in the light most favorable to plaintiff and assumed that the change in supervisors was made with plaintiff's protected activity in mind.

Third, the reprimand in May 2006 involved plaintiff's use of leave time. Plaintiff requested permission to attend the three-month state legislative session during January, February, and March 2006 to lobby on behalf of the Kentucky Professional Firefighters. Chief Possich granted the request, with the stipulation that plaintiff work on the crew

whenever possible and maintain the required monthly training hours. When the legislative session concluded, plaintiff took vacation for most of the month of April, worked one shift on April 24, and then called in sick for the next three shifts for which he was scheduled to work (April 27, April 30, and May 1). Even with this time off, plaintiff managed to voice objections to the proposal that the Assistant Fire Chief position be removed from the civil service. Plaintiff also prepared and distributed a response to another firefighter's resignation from the union with what the district court appropriately referred to as a "call to arms" to union members to fight the department's "assaults" on the civil service.

Possich prepared a written reprimand on May 4, 2006, charging plaintiff with abuse of sick leave and requiring, by way of discipline, that plaintiff provide a physician's statement in order to use sick time in the future. In addition, because plaintiff had taken an excessive amount of time off work during the previous 16-month period, Possich notified plaintiff that he would not be approved for any further trade time, vacation, or holiday leave for the remainder of the year.[3] Plaintiff was called in on May 4, presumably to receive the reprimand, but he refused and then did not report for his next shift on May 9. Possich and another firefighter delivered the reprimand to plaintiff's home on May 10, after which plaintiff filed a lengthy complaint alleging retaliation and harassment. Plaintiff retired May

---

[3]Possich reported, and plaintiff does not dispute, that although scheduled for 122 days in 2005, plaintiff only worked 23 full duty shifts (8 of which were doing Hurricane Katrina relief work) and 16 partial duty shifts during that year. Over the previous 16 months, plaintiff worked a total of 29 full duty and 17 partial duty shifts.

31, 2006, and filed this action in state court on June 2, 2006.[4]

After removal of the case to federal court and an opportunity for discovery, defendants moved for summary judgment on several grounds. On October 3, 2007, the district court granted defendants' motions, entered summary judgment in favor of defendants on the First Amendment claim, and declined to exercise supplemental jurisdiction over the state law claims. Plaintiff filed a timely motion to alter or amend judgment, which was denied in orders entered on November 7 and 13, 2007. This appeal followed.

## II.[5]

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In deciding a motion for summary judgment, the court must view the factual evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When an appeal is from the grant of summary judgment and the denial of a Rule 59(e) motion to reconsider that decision, our review of both decisions is *de novo*. *Smith v. Wal-Mart Stores, Inc.*, 167 F.3d 286, 289 (6th Cir. 1999); *Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997).

To state a *prima facie* case of retaliation in violation of the First Amendment, a

---

[4]It appears that plaintiff had decided to retire sometime before April 27, 2006, but it is not clear when Possich became aware of it.

[5]Possich also argued that he was entitled to qualified immunity because the plaintiff's First Amendment rights were not clearly established at the time. Concluding, as the district court did, that plaintiff cannot demonstrate a constitutional violation, we do not reach this issue. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The first step in the qualified-immunity analysis is to determine whether the facts, viewed in the light most favorable to the plaintiff, show that a constitutional violation occurred. *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003).

plaintiff must show that he engaged in constitutionally protected speech, that he was subjected to adverse action or was deprived of some benefit, and that the speech was a substantial or motivating factor in the adverse action. *Brandenberg v. Hous. Auth. of Irvine*, 253 F.3d 891, 897 (6th Cir. 2001) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). A public employee must meet additional standards to establish that the speech is constitutionally protected. *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). Specifically, the public employee plaintiff must demonstrate (1) that he was speaking as a citizen addressing matters of public concern; and (2) that his interest in addressing those matters of public concern outweighs his employer's interest "in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); *see also Connick v. Myers*, 461 U.S. 138, 143 (1983). Although there may be factual questions about what expression occurred, we have recognized that both the issue of whether the speech addresses a matter of public concern and the application of the balancing test are questions of law that we review *de novo*. *Leary*, 349 F.3d at 898; *Farhat v. Jopke*, 370 F.3d 580, 589 (6th Cir. 2004).

**A.      Matter of Public Concern**

In general, speech addresses a matter of public concern when it "involves 'issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government.'" *Brandenberg*, 253 F.3d at 898 (citation omitted). This is in contrast with internal personnel disputes or complaints about an employer's actions. *Id*. (citing *Brown v. City of Trenton*, 867 F.2d 318, 322 (6th Cir.

1989)). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48. While motivation is relevant, "the pertinent question is not *why* the employee spoke, but *what* he said." *Farhat*, 370 F.3d at 591.[6]

This court has assumed that the classification of positions in public employment within or outside the civil service is a matter of public concern. *Dotson v. Abramson*, No. 93-6542, 1995 WL 9267 (6th Cir. Jan. 10, 1995) (unpublished). Indeed, in *Connick*, the Court noted the "demonstrated interest in this country that government service should depend upon meritorious performance rather than political service." 461 U.S. at 149. While defendants have not challenged the district court's findings in this regard, a brief summary is helpful in weighing the competing interests under *Pickering*.

We turn first to the speech concerning the EMS Director and EMS Shift Supervisor positions, which the district court found did not touch on matters of public concern. In early 2003, it appeared that the EMS Director position might be filled by Deron Rambo. Plaintiff raised a number of objections to Rambo's eligibility for the position, and applied for the position himself. Plaintiff was interviewed, but no one was selected at that time. The position ultimately went to Greg Moore, a member of the union. As the district court found, the written documentation revealed that "Fitzpatrick's concerns were primarily over the

---

[6]The Supreme Court has clarified that a public employee does not speak as a citizen on matters of public concern when the expressions are made "pursuant to his or her official responsibilities." *Garcetti v. Ceballos*, 547 U.S. 410, 424 (2006). Here, defendants conceded that the speech at issue was not made pursuant to the official duties of plaintiff's employment. *Compare Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 542-47 (6th Cir. 2007) (holding that plaintiff's comments made to a consultant hired by the employer to perform a departmental evaluation were not made as a citizen as required for First Amendment protection).

perceived bias in favor of Rambo specifically, not over the future of the position within the civil service."

Similarly, the district court found that the objections plaintiff voiced concerning the designation of three EMS Shift Supervisors did not mention civil service concerns. The Board of Commissioners ultimately rejected plaintiff's complaint, explaining that Shift Supervisor was only a temporary duty assignment. The district court added that even if civil service concerns underpinned plaintiff's objections, those concerns could not be objectively perceived to be the point of the grievances plaintiff brought.

Next, Possich created the position of Emergency Preparedness Coordinator outside the classified civil service, and selected Rambo to serve in that capacity. Plaintiff explained in his deposition that he never complained about the decision to create the position, only that Rambo was allowed to perform firefighting duties. This dispute, however, was also included in the letter that was the "call to arms" to defend the civil service. As a result, the district court assumed that plaintiff's speech regarding this position touched on matters of public concern.

Plaintiff's opposition to the proposal that the Assistant Fire Chief position be removed from the civil service was the only speech specifically found to address a matter of public concern. In a March 2006 letter resigning from the union, Greg Moore charged that the union was pressing "mainly personal agenda items often tearing at our department." Plaintiff's response, set forth in the open letter already mentioned, restated the disputes regarding the EMS Director and Shift Supervisor positions, defended the union's objections

to the scope of the duties of the Emergency Preparedness Coordinator, and characterized the proposed change to the Assistant Chief position as an "assault" on the civil service system.

Finally, a public employee's speech, activity, or association does not address a matter of public concern merely because it is union related. *Boals v. Gray*, 775 F.2d 686, 692 (6th Cir. 1985). Here, plaintiff does not contest the district court's determination that even when his speech addressed union issues, it was directed at personnel or internal policy issues rather than a matter of public concern. While plaintiff's union membership was recognized as expressive conduct protected by the First Amendment, claims of retaliation for expressive association are analyzed under *Pickering*'s two-part balancing test as well. *Id*.; *see also Akers v. McGinnis*, 352 F.3d 1030, 1036 (6th Cir. 2003).

## B.    *Pickering* **Balancing Test**

Once it is determined that at least some speech or association is protected, *Pickering* instructs us to balance Fitzpatrick's interest in addressing these matters or associating with the union against the City's interest in promoting efficiency and maintaining discipline in the public service. *Connick*, 461 U.S. 150; *Pickering*, 391 U.S. at 568. The Court has explained that the government "must have wide discretion and control over the management of its personnel and internal affairs," including "the prerogative to remove employees whose conduct hinders efficient operation," because "[p]rolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency." 461 U.S. at 151 (internal quotation marks and citation omitted). These interests have particular

resonance in the context of public safety departments, where loyalty, discipline, and workplace harmony are especially important. *See*, *e.g.*, *Brown v. City of Trenton*, 867 F.2d 318, 322-23 (6th Cir. 1989); *McMurphy v. City of Flushing*, 802 F.2d 191 (6th Cir. 1986). The district court, referring to these interests as "esprit de corps" concerns, found plaintiff's protected expression was disruptive to discipline and workplace harmony such that defendants were justified in taking the actions plaintiff alleges were retaliatory. *See Meyers v. City of Cincinnati*, 934 F.2d 726, 730 (6th Cir. 1991) ("[W]e look for evidence of the impact of the statement on the city's legitimate organizational interests.").

Plaintiff argues on appeal that it was clear error to find his speech and association impaired the "esprit de corps" of the department. In support, plaintiff relies on testimony from several superiors, including: the statement from plaintiff's captain that he never had cause to reprimand or discipline plaintiff; the opinion of Lt. Travis that plaintiff was a team-oriented person who was good in the station and with the public; and the acknowledgment by Possich and Unger that many of the issues raised were valid concerns about safety that involved staffing levels, equipment upgrades, and policies and procedures. This evidence, however, does not undermine the district court's finding that the protected speech and association undermined Possich's authority and impaired the "esprit de corps" of the department.

The government's burden to show adequate justification for its acts varies depending on the nature of the employee's protected expression. *Connick*, 461 U.S. at 150. That is, the greater the extent to which the speech involves matters of public concern, the stronger the

employer's showing must be. *Id*. It is not necessary, however, "for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Id*. at 152.

We agree with the district court's assessment that the record reflects the disruptive nature of plaintiff's repeated objections and grievances concerning Rambo's position as Emergency Preparedness Coordinator and the proposal to remove the Assistant Fire Chief position from the civil service. Plaintiff testified that he brought these issues up in union meetings and got the union to support his complaints. With plaintiff's later distribution of the "call to arms" letter to union membership in the workplace, plaintiff's speech openly encouraged dissension by inciting the union membership to "fight" the department's decisions on these issues. Plaintiff's letter announced that the union was seeking legal advice about blocking the change to the Assistant Chief position. It is also beyond dispute that plaintiff used his association with the union as a vehicle for voicing opposition to Possich's decisions. The district court did not err in finding that this showing met defendants' burden. *Connick*, 461 U.S. at 153 (emphasizing that "'the employing agency's institutional efficiency may be threatened not only by the content of the employee's message but also by the manner, time, and place in which it is delivered'") (citation omitted).

Further, we can not ignore evidence of dissension in the department, disharmony between coworkers, and impairment of discipline reflected in the opposing letters sent in the wake of plaintiff's "call to arms." In early April 2006, an unsigned letter on union stationary was written to the Board of Commissioners to express the union's "extreme displeasure" with

the leadership provided by Possich and asking that they intervene on behalf of the firefighters.[7] That letter complained specifically that there were firefighters working in supervisory roles without testing through the civil service process. This "no confidence" letter summarized by saying that Possich's inaction on several issues "has produced feelings of distrust and disrespect throughout the ranks of the department and the inconsistencies in his leadership have caused a severe lack of confidence in his future capacities to take the department forward progressively and professionally." A response dated April 21, 2006, was sent to commissioners and city officials to express confidence in Possich's leadership and attribute the "latest attack" on Possich to a few disgruntled employees. This letter also blamed the drop in union membership to fewer than half of the firefighters on "several [other] letters of similar tone and nature."

Finally, plaintiff argues that the district court erred in granting summary judgment to defendants because there is a "classic genuine issue of material fact" regarding the motivation for the change in supervisors. Plaintiff specifically emphasizes that Possich, Boggs, and Unger denied making the statements relied upon to draw the inference of retaliation. This argument misapprehends the issue. While it is true that the evidence was disputed on this point, we, like the district court, have assumed that there was a "manipulation" of the supervisory assignments in retaliation for plaintiff's protected speech or association. This is clear from the district court's conclusion that *if* the assignment of Boggs to supervise plaintiff's crew was motivated by a "desire to 'straighten Fitzpatrick out,'

---

[7]Plaintiff denied authoring this letter, but admitted to having reviewed a draft.

i.e., suppress his disruptive speech, then it is clear that the Defendants reasonably relied on the 'esprit de corps' objective in authorizing the transfer." If the decision was made, as Unger apparently suggested, only to more effectively supervise plaintiff's "ride time" and training hours, that would not be actionable retaliation for First Amendment purposes.[8]

**AFFIRMED.**

---

[8]Similarly, to the extent that plaintiff may argue that the reprimand in May 2006 was not driven by a retaliatory motive, the disciplinary action is irrelevant to this retaliation claim. The district court reasoned that if plaintiff's allegations about selective withholding of leave time are accurate, then the reprimand restricting and denying plaintiff leave may be seen as punishment intended to curtail plaintiff's disruptive speech. The district court explained that: "The fact that these reprimands did not explicitly focus on limiting the scope of Fitzpatrick's speech does not cast doubt on the "esprit de corps" motivations. When an employer decides to discipline an employee in the hope of reducing the employee's disruptive behavior, and thus promote workplace harmony, the employer may pursue the discipline in many different ways. It is not the duty of the courts to require government employers to utilize the most optimal, or even the most obvious, ways of promoting 'esprit de corps.' Instead, the courts are instructed to defer to government employers' judgment on their disciplinary and personnel decisions."