**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 14a0546n.06**

No. 13-6184

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jul 23, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| FIFTH THIRD BANK, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| GULF COAST FARMS, LLC, and GULF | ) | THE EASTERN DISTRICT OF |
| COAST FARMS BLOODSTOCK, LP, | ) | KENTUCKY |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

BEFORE: BOGGS and CLAY, Circuit Judges; and COHN, Senior District Judge.[*]

**AVERN COHN, Senior District Judge.** This is a case about a horse; more specifically about the right to a share in a horse. Plaintiff Fifth Third Bank ("Fifth Third") filed a declaratory judgment action seeking the right to $220,000 currently deposited with the district court as the proceeds from the sale of a share of a thoroughbred stallion, Distorted Humor. As will be explained, a limited liability company and a partnership dispute the ownership of the share.

---

[*]The Honorable Avern Cohn, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

In 2011, a state court ordered Defendant Gulf Coast Farms, LLC ("the LLC") to sell all of the horses and shares in horse syndicates that it owned and give to Fifth Third all of the net proceeds

from the sales. The essential issue before the district court was whether Fractional Interest No. 49 in Distorted Humor ("the Share") was owned by the LLC or by Defendant Gulf Coast Farms Bloodstock, LP ("the Partnership"). If the LLC owned the Share, Fifth Third was entitled to the proceeds.

After a thorough review of the evidence, the district court concluded that the LLC owned the Share and granted summary judgment to Fifth Third. We agree and AFFIRM.

## I.

### A.

It is first important to note that the principals of the LLC and the Partnership overlap. The members of the LLC are: Lance K. Robinson, Gerald F. Bailey, Jefferson T. Dunford, Jeffrey Collett, Gary W. Millet, and Cypress General Partners, Inc. ("Cypress"). Cypress is owned by Robinson, Bailey, Dunford, and Collett. The partners in the Partnership are: Cypress, Robinson, and Bailey.

In 2003, the Partnership purchased the Share from WinStar Farms ("WinStar"), the syndicate manager of the Distorted Humor syndicate. At the time, the stallion at was located at WinStar's farm in Woodford County, Kentucky. The purchase agreement gave WinStar a right

2

of first refusal upon a subsequent sale of the Share. The Partnership dissolved in 2004 when one partner withdrew. At that time, the remaining partners formed the LLC.

The events leading to this dispute began in 2009 and 2010 when Fifth Third loaned the LLC approximately $15 million dollars in two loans. The LLC pledged the Share and other assets as collateral for these loans. In a 2009 Loan and Security Agreement, the LLC granted Fifth Third a security interest in its rights and interests in "stallions . . . stallion syndicate agreements, fractional interests in stallions and stallion shares . . . ." In a 2010 Loan and Security Agreement, the LLC similarly granted a security interest in "stallions . . . stallion syndicate agreements . . . stallion shares and/or fractional interest(s) in any of the foregoing . . . ." At the time of the loans, the Share was the most valuable asset included on the collateral provided by the LLC, valued at $2,750,000.

In 2011, the LLC defaulted on the loans. Following default, Fifth Third sued the LLC in state court for breach of contract. *Fifth Third Bank v. Gulf Coast Farms, L.L.C., et al.*, No. 11-CI-88 (Fayette Cir. Ct.). Fifth Third also sued the individual members of the LLC—Robinson, Bailey, Dunford, Collett, and Millet— claiming that they were guarantors of the loans and in turn breached their obligations. As noted above, the state court granted Fifth Third relief and ordered that the proceeds from the sale of each stallion share owned by the LLC be paid directly to Fifth Third. The state court order was entered on August 24, 2011.

Also in 2011, the Partnership attempted to sell the Share to a third party. WinStar exercised its right of first refusal and purchased the Share. The proceeds from the sale were

$220,000. As the sale to Winstar was nearing completion, it was discovered that WinStar's records showed that the Partnership, not the LLC, owned the Share.

**B.**

After the sale to WinStar, Fifth Third filed this declaratory judgment action in state court, seeking a declaration as to whether the LLC or the Partnership owned the Share in 2009 and 2010 when the loan transactions took place. Fifth Third alleged that the LLC and its agents represented to it on multiple occasions that the LLC owned the Share and that Fifth Third relied on these representations in extending the loans to the LLC. Fifth Third also sued WinStar, seeking an order requiring that WinStar[1] turn over the proceeds from the sale. The defendants removed the case to federal court on the grounds of diversity jurisdiction.

The Partnership filed a counterclaim against Fifth Third, claiming that Fifth Third tortiously interfered in the Partnership's contractual relationship with WinStar regarding the sale of the Share. The Partnership also alleged a claim for conversion.

Eventually, the LLC filed a motion for summary judgment on the grounds that there was no genuine issue of material fact that the Partnership, not the LLC, owned the Share. The district court denied the motion, finding that Fifth Third had carried its burden to produce evidence which, at that point, demonstrated a genuine issue of fact as to the ownership of the Share.

---

[1]WinStar was later dismissed upon depositing the proceeds of the sale with the Clerk of the Court.

4

After additional discovery, the Partnership and Fifth Third filed cross motions for summary judgment on the issue of ownership. The district court concluded that the record displayed no genuine issue of material fact that the LLC, not the Partnership, owned the Share. Accordingly, the district court granted Fifth Third's motion and denied the Partnership's motion. The district court also dismissed Fifth Third's claims against the individual defendants and Cypress as well as the Partnership's counterclaim.

## II.

The grant of a motion for summary judgment is reviewed *de novo*. *Chapman v. UAW Local 1005*, 670 F.3d 677, 680 (6th Cir. 2012) (en banc). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We must consider "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, (1986). In determining whether there is a "genuine issue for trial," we interpret the facts and draw all reasonable inferences therefrom in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**III.**

**A.**

The parties agree that the issue of ownership of the Share is governed by Kentucky law. *United States v. 5854 N. Kenmore*, 762 F. Supp. 204, 209 (N.D. Ill. 1991) (citing *United States v. Certain Real Prop.*, 910 F.2d 343 (6th Cir. 1990)) (holding that, with respect to civil forfeiture actions, "property issues concerning ownership are governed by the laws of the state in which the property is located."). Under Kentucky law, ownership of property is determined from "all the factors involved" including "the intent of the parties to a particular transaction." *McKenzie v. Oliver*, 571 S.W.2d 102, 105 (Ky. Ct. App. 1978).

**B.**

The district court conducted a complete review of the record and concluded that the evidence pointed to only one conclusion over which reasonable minds would not disagree—that the LLC owned the Share. We agree. What follows is some, but not all, of the evidence of ownership that undisputedly shows that the LLC owned the Share.

First, the deposition testimony of Jefferson T. Dunford ("Dunford"), a principal in both the LLC and the Partnership, provides significant evidence of the LLC's ownership. Dunford, a certified public accountant, testified that in 2004, the partners agreed to transfer their assets to the newly formed LLC. Dunford testified that this was the partners' "understanding when we moved everything from [the Partnership] out and made the distributions to the partners. Then

6

capital and everything to recapitalize LLC came in with . . . the percentages the way they are shown." In addition, Dunford stated, "[w]e did a distribution out of [the Partnership] to individuals . . . . [T]he individuals got a distribution of their ownership out of there and then . . . contributed capital to the new entities. . . . I am not aware of any . . . document that shows any kind of transfer of ownership because that is not what we did. We did—we did a transfer of ownership there."

Dunford's testimony is consistent with actions he took in 2004 when he prepared and filed a tax return on behalf of the Partnership. He marked the return as "Final Return." The Form 1065 indicates that the Partnership did not hold any stallion shares at the end of 2004, nor did it hold any assets. The Partnership did not file any tax return after 2004 even though the Share generated income. Dunford testified that, at the time he filed the return, he "thought everything was distributed out of the company and that it was a final return and that there was nothing left in [the Partnership]. It wasn't until later that I came to understand that we had kept one stallion share in there." Dunford testified, "I just was under the assumption . . . we had started a new entity and everything was moving over and everything was out of the other entity." Dunford also prepared the LLC's tax returns for the years 2005 to 2012. He further testified that for these years, all income produced from ownership in the Share was reported on the LLC's tax returns. Finally, Dunford testified that from 2004 on, checks representing income from the Share would have been deposited into the LLC's account. Moreover, the LLC, not the Partnership, purchased insurance policies covering the Share and was the named insured on the policies.

7

On the subject of insurance, Dunford's testimony is confirmed by representations made in a 2010 lawsuit filed against the Partnership, the LLC, and others by Fortuna Insurance Services seeking unpaid insurance premiums. *Fortuna Ins. Servs., LLC v. Gulf Coast Farms, LLC, et al.*, No. 10-CI-7222 (Fayette Cir. Ct.). *Fortuna* was pending at the same time as this case. In the *Fortuna* action, the LLC and the Partnership consistently maintained that the Partnership could not be liable for the unpaid premiums because it was "the defunct predecessor entity" to the LLC and had been dissolved and "inactive since 2004." The Partnership and the LLC owners admitted that the LLC purchased certain policies from Fortuna between May 2008 and November 2010 but denied that the Partnership was ever obligated to pay any premiums because it was "out of business when each of the listed policies was issued." The LLC and Partnership owners asserted an affirmative defense that Fortuna was "precluded from recovery against [the Partnership] because that entity ceased operation in 2004 and is a dissolved, defunct entity." Indeed, the Partnership and the LLC moved to dismiss the *Fortuna* case, stating that the Partnership is "a defunct limited partnership, which was succeeded" by the LLC and that, at the time of the Partnership's dissolution, all of its business "was taken over by the LLC, and [the LLC] is the only active entity that has done business with [Fortuna]. . . [the Partnership] could not have done business with Fortuna from May 2008 through November 2010 . . . because [the Partnership] ceased to exist in 2004." Counsel for the Partnership and the LLC in the *Fortuna* matter, also counsel in this case, went so far as to caution Fortuna's counsel that Fortuna did not even have "a good faith basis for joining" the Partnership in the matter because it "is a

predecessor entity which was replaced in 2004 by the formation of [the LLC]. It has been dissolved and no longer exists."[2]

Further, during the negotiation process for the Fifth Third loans, Dunford consistently represented that the LLC owned the Share and that the Share would serve as collateral for the loans. For example, on October 2, 2009, via e-mail, Chad Lashbrook ("Lashbrook") of Fifth Third asked Dunford for a "current horse collateral list." Dunford responded on October 15, 2009 with various lists all of which are captioned "GULF COAST FARMS, LLC, Taylor Made Farm Appraisals September 2009." The first list provides the names and values for each of the LLC's stallion shares. The first share on that list is the Share in Distorted Humor. The list states that the Share was acquired in January 2003 and has a fair market value of $2,750,000. Dunford testified that, at this time, he believed that the LLC owned the Share.

On April 18, 2010, Dunford e-mailed Lashbrook a list of entities related to the LLC and an "Updated Horse Listing – broken out by entity." The Partnership is not included on the related-entity list. The attached horse lists are again captioned "GULF COAST FARMS LLC Taylor Made Farm Appraisals December 2009." The Share appears first on the list. Dunford

---

[2] In an attempt to overcome these telling statements, the Partnership filed an amended answer in *Fortuna* after Fifth Third filed its motion for summary judgment in this case. In the amended answer, the Partnership asserted that it was dissolved but had been "revived." It further asserted that while the Partnership continued to own some assets after its dissolution and the creation of the LLC, it still was not liable in that action. As the district court correctly concluded, the amended answer is not evidence of what the Partnership and the LLC intended in 2004 when the Partnership was dissolved or in 2009 and 2010 when the loan agreements were executed. Moreover, the Partnership and the LLC cannot avoid summary judgment by submitting evidence that contradicts their prior assertions. *See Penny v. United Parcel Post*, 128 F.3d 408, 415 (6th Cir. 1997).

9

testified that at the time of this e-mail, he believed that the LLC owned the Share. Months later, on October 6, 2010, Dunford sent another set of horse lists to David Verville and Joseph Escola of Fifth Third. Each list is captioned, "GULF COAST FARMS, LLC Horse List September 2010." Again, the Share is listed as the first of such shares. This time, however, Dunford stated in an e-mail to Fifth Third, "I have tried hard to make this accurate . . . , but I go off of lists available to me since I'm not around the horses – so we'll hope it's accurate." Nevertheless, despite any perceived uncertainty in his statement, Dunford testified that at the time he forwarded this list, he believed that the LLC owned the Share.

Additional evidence that the LLC owned the Share is found in the record of the state court case in which Fifth Third sued the LLC for defaulting on the loans. In a response to Fifth Third's motion to appoint a receiver in the case, the LLC and the Partnership owners stated that the LLC currently owns "all or part of five thoroughbred horses and eleven stallion shares." The LLC and Partnership owners also asserted that the stallion shares owned by the LLC were accurately depicted in a chart attached to the pleading. That chart is captioned "GULF COAST FARMS LLC Thoroughbred Stallion Shares." It sets forth the eleven stallion shares owned by the LLC. The first share listed is the Share.

Communications between counsel for the Partnership and the LLC and counsel for Fifth Third regarding the state court case also support a finding that the LLC owns the Share. One example is seen in a January 5, 2011 letter to Fifth Third's counsel that he was enclosing "another copy of the Gulf Coast Farms, LLC Horse List September 2010." The list is captioned

"GULF COAST FARMS LLC Horse List September 2010." The Share is the first share on the list. Counsel for the Partnership and the LLC also informed Fifth Third that two stallion shares had been sold. These two shares – Northern Afleet and Afleet Alex – are marked "gone" on the list. There is no such indication for the Share.[3]

## C.

### 1.

Neither the LLC nor the Partnership disputes the evidence detailed above. Rather, the LLC and the Partnership dispute the conclusions that can be drawn from the evidence and they put forth other facts that they say call into question the district court's finding. Neither tactic carries the day.

As they did before the district court, the LLC and the Partnership point to statements in Dunford's testimony that they believe shows a genuine dispute of fact as to whether Dunford actually told Fifth Third that the LLC owned the Share. They note that Fifth Third requested only a list of horse interests owned by "Gulf Coast entities," which they say could mean both the LLC and the Partnership. This argument is unavailing. In an October 2, 2009 email, Lashbrook at Fifth Third clearly requested a "current horse collateral list." Fifth Third's request cannot reasonably be interpreted as requesting information regarding shares owned by anyone other than

---

[3]Fifth Third argues that these statements in the state court action and communications between counsel implicate the doctrine of equitable estoppel and are binding as judicial admissions. The district court did not address this argument. We likewise decline to address the argument because it is not necessary for resolution of the appeal.

the LLC.  Moreover, to establish ownership, the focus is not on what Fifth Third knew; it is what the LLC and the Partnership intended as to ownership.

In addition, the LLC and the Partnership make much of excerpts from Dunford's deposition testimony in which he appeared to indicate that the Share was still owned by the Partnership.  Dunford's statements relate to the fact that WinStar's records still showed that the Partnership owned the Share.  The sum and substance of Dunford's testimony is that he believed, and the documentary evidence supports, that the LLC owned the Share upon the dissolution of the Partnership in 2004.

The LLC and the Partnership relatedly argue that the record contains evidence that Fifth Third did not believe that the LLC owned the Share or that the Share would serve as collateral. This argument lacks merit.  Even assuming that the LLC and the Partnership are correct, and putting aside the district court's conclusion that the cited evidence does not indicate that Fifth Third knew that  the LLC did not own the Share, it is irrelevant.  As the district court aptly stated: "The question is what the Partnership and the LLC believed.  There can be no question that the principals of both understood and intended that the LLC owned the Share."  Moreover, the LLC's and the Partnership's argument that Fifth Third should have further investigated ownership is not well taken.  Again, it is not relevant what Fifth Third did or should have done; the question of ownership is between the LLC and the Partnership and is established through their many representations of ownership.

Finally, the LLC and the Partnership note that WinStar's records show that the Partnership owned the Share, not the LLC. This fact is neither material to nor dispositive of the issue of ownership. Instead, ownership is dependent upon what the LLC and the Partnership intended as to ownership, not what WinStar's records may show.

**2.**

The Partnership and the LLC further argue that the district court erred in rejecting their argument that any transfer of the Share to the LLC was invalid because it violated the right of first refusal provision in the Distorted Humor Syndicate Agreement found under section 11(b) of the Syndicate Agreement. Section (b)(1) provides in pertinent part:

> Fractional Interests . . . may be sold, transferred, assigned, alienated, or disposed of privately . . . only as follows:
>
> (1) The [Syndicate] Members shall have the right of first refusal for the purchase of any Fractional Interest(s) . . . which any Member . . . may at any time desire to sell, subject to the provisions of subsection 11(e) and 11(f). Accordingly, any Member . . . who desires to sell or dispose of one or more Fractional Interest(s) . . . . shall, upon receipt of a bona fide offer for such Fractional Interest(s) . . . which he desires to accept, notify the Syndicate Manager in writing of the price, terms and conditions at which he will sell such Fractional Interest(s) . . . and the name of the offeror.

The Syndicate Agreement goes on to state that Winstar must notify all the other members of the "name of the individual wishing to sell his Fractional Interest(s) . . . the name of the offeror, the amount of such offer and the terms and conditions thereof." Each of the syndicate members then has seven days "to notify [WinStar] whether he elects to purchase such Fractional Interest(s) . . . . Such election to purchase shall be at the price and subject to the same terms and

13

conditions as the bona fide offer received by the selling Member."  If no member "elects to purchase the available Fractional Interest(s) . . . [WinStar] shall have the exclusive right and option . . . to purchase, at the specified price and upon the specified terms, any or all of such available unpurchased Fractional Interests ."  "If neither [WinStar] nor any [Syndicate] Members elects to purchase" the share from the member "who desires to sell the same," then the share is "freely alienable."

From the above, the right of first refusal ripens when (1) the owner has a desire to sell an interest, (2) there is a bona fide offer to purchase that interest, (3) the owner of the interest wants to accept the offer, and (4) either a syndicate member or the syndicate manager wants to purchase the interest on the same terms as the offer.

Fifth Third argues that the district court correctly found that the Partnership's transfer of the share to the LLC did not trigger the right of first refusal provisions because the entities have common ownership.  We agree.  The district court, relying on *Evans v. SC Southfield Twelve Assoc., LLC*, 208 F. App'x 403 (6th Cir. 2006), concluded that a right of first refusal was not triggered.  In *Evans*, a panel of this court held that a right of first refusal provision in a lease was not triggered when the landlords transferred their interest in the property to an LLC owned by the landlords.  The panel found that the right of first refusal was triggered only on two conditions. First, the landlord must "desire to sell" the property and, second, the landlord must have received a "bona fide written offer" to purchase the property.  *Id*. at 406.  The panel agreed with the district court that the landlord had no "desire to sell" the property under Michigan law because

the transfer was not supported by valuable consideration. *Id*. at 407. The panel concluded that it was "beyond dispute that the proposed transfer of interest from the Evans to Talrae [(the LLC0] was not the result of arms' length dealing and would not result in any real change in control of the property. Under these circumstances, we agree that the right of first refusal was not triggered." *Id.* at 408.

The same is true of the transfer of the Share from the Partnership to the LLC. There was no meaningful change in control of the property. There was no desire to sell, no bona fide offer or purchase, nor were there any terms of sale of any kind. Simply put, the transfer did not invoke the right of first refusal provision. This conclusion is consistent with decisions from other jurisdictions. *See, e.g., Creque v. Texaco Antilles Ltd.*, 409 F.3d 150, 155 (3d Cir. 2005) ("A right of first refusal to purchase real property is not triggered by the mere conveyance of that property. Only when the conveyance is marked by arms' length dealing and a change in control of the property may that right be exercised."); *McGuire v. Lowery*, 2 P.3d 527, 532 (Wyo. 2000) (holding that "for a transaction to constitute a 'sale' and trigger a first right of refusal, it must involve an arms-length transaction resulting in an actual change in control of the burdened property rather than simply moving it from the individual owners to an entity controlled by them."); *Wallasey Tenants Ass'n v. Varner*, 892 A.2d 1135, 1141-42 (D.C. 2006) (holding that transfer of property from an individual to a corporation wholly owned by the same individual was not a sale triggering a right of first refusal); *Kroehnke v. Zimmerman*, 467 P.2d 265, 267

(Colo. 1970) (transfer of interest in real property from individual owners to corporation in which they owned all the stock did not trigger right of first refusal).

### 3.

Overall, we are satisfied from a *de novo* review of the record that there is no genuine issue of material fact as to whether the LLC or the Partnership owned the Share. The record evidence leads to only one reasonable conclusion—the LLC owned the Share. It owned the Share as of 2004 when the Partnership dissolved and its assets, which included the Share, were transferred to the LLC. The LLC owned the Share at the time it obtained loans from Fifth Third and made representations of that ownership. In accordance with the state court order, Fifth Third is entitled to the proceeds from the sale of the Share.

The district court correctly granted summary judgment to Fifth Third because the LLC owned the Share at all times relevant to this case. Additionally, the Partnership's state law claims for conversion and tortious interference were properly dismissed as the claims were premised on the Partnership owning the Share.

### IV.

For the reasons stated above, the district court is **AFFIRMED**.