NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0129n.06

No. 12-1038

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| JULIE PUCCI | ) | **FILED** |
| | ) | Feb 13, 2015 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | |
| | ) | |
| NINETEENTH DISTRICT COURT, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| Defendant, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| CHIEF JUDGE MARK W. SOMERS, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE: BATCHELDER and GIBBONS, Circuit Judges; MALONEY, District Judge.[*]

JULIA SMITH GIBBONS, Circuit Judge. Mark Somers, the chief judge of a Michigan district court, fired court employee Julie Pucci after she complained to a state administrative agency about Somers's use of religion on the bench. A jury awarded Pucci damages for Somers's violation of her constitutional rights to due process and free speech. On appeal, Somers challenges several of the district court's trial rulings. We affirm.

---

[*] The Honorable Paul L. Maloney, Chief United States District Judge for the Western District of Michigan, sitting by designation.

I.

A.

Julie Pucci began working at Michigan's Nineteenth District Court in 1991. Located in Dearborn, the court is one of ninety-eight district courts in the state. *See* Mich. Comp. Laws §§ 600.8111 to 800.8163. The district court is its own administrative unit, but it receives funding from the City of Dearborn and is under the supervisory authority of the Michigan Supreme Court, *id.* §§ 600.8101(1), 600.8103(3), which appoints the chief district judge to a two-year term, Mich. Ct. R. 8.110(B). The chief district judge is responsible for the hiring and firing of court employees in the Nineteenth District, as well as other administrative matters. *Id.* R. 8.110(C)(3). The State Court Administrative Office (SCAO), the administrative arm of the Supreme Court, oversees all of the state's lower courts. *See* Mich. Comp. Laws § 600.1493. The SCAO recommends candidates for chief district judge to the justices of the Michigan Supreme Court, who make the appointment.

Pucci began working as a clerk and typist in 1991. She worked her way up, becoming a probation officer, then a judicial aide, then Clerk of Court, and then—in 1995—Assistant Court Administrator. That position was later reclassified as Deputy Court Administrator, and Pucci remained in that role until 2006. In 2001, Pucci began a romantic relationship with Judge William Hultgren, one of the three judges on the Nineteenth District Court. They began living together and became engaged in 2004.

In 2004, Pucci became concerned that Judge Mark W. Somers, one of the other district judges, was expressing religious views in the course of performing his job as a judge. She saw a letter that Somers had written to a potential juror, which contained a biblical passage in the letterhead. She contacted the SCAO to report her concern. An SCAO representative contacted

Somers to discuss the issue, and learned that Somers had apparently already stopped using the letterhead. Pucci also spoke to the SCAO on at least one other occasion about Somers's behavior including his discussions about religion in open court. When asked about Somers's suitability for the chief judge position, she replied that she would not recommend him because "he mixes religion with the business of the court." She explained: "[M]y job isn't to critique judges. We have got people in place for that. But as a person, as an individual, as a citizen, I was . . . offended." According to Hultgren, Somers was aware that Pucci had made the complaints. Somers denied having any knowledge of the complaints.

Pucci was not the only employee to complain to the SCAO about Somers's use of religion. Sharon Langen, the Clerk of Court, also complained about the use of the religious letterhead and later reported that he was "literally preaching from the bench." Langen found some of Somers's behavior "very offensive personally. . . ."

Somers's relationships with Pucci and Hultgren began to deteriorate. Pucci observed a change in Somers's attitude toward her after she made the first complaint to the SCAO. On one occasion in February 2005, Somers—in the midst of a discussion about a change in the district court's docket rotation—told Hultgren that he was unhappy with Pucci working for the court in light of her relationship with Hultgren. In the course of the conversation, Hultgren told Somers that he could not support him for the chief judge position.

In January 2005, then-Chief Judge Virginia Sobotka retired with time still remaining in her term, leaving the SCAO to appoint a new chief. While there was a vacancy, Hultgren was serving as chief judge *pro tem* in the Nineteenth District, handling day-to-day administrative matters. But the SCAO decided it would be inappropriate to appoint Hultgren to the full chief position because, in light of his relationship with Pucci, it would "violate[] the spirit" of the court

system's anti-nepotism policy. The SCAO also believed that Somers was too new to the bench to become chief. In March 2005, the SCAO appointed Judge Leo Foran to the chief judge position. Foran was already the chief judge of the neighboring Twentieth District, so the SCAO asked him to serve as chief of both courts. Hultgren continued as chief judge *pro tem* in the Nineteenth District.

Soon after Foran became chief in the Nineteenth District, he learned that the Court Administrator planned to leave. Foran had observed Pucci in her Deputy Court Administrator role, knew that she had been "groomed for the job," and believed that she was already effectively "doing the duties of both Court Administrator and Deputy Court Administrator." He therefore decided to combine the two roles into one. He planned to promote Pucci to Court Administrator, leave the Deputy position unfilled, and leave Langen as Clerk of Court. He also intended to hire an executive secretary to assist Pucci and Langen.

Somers disliked this plan and said so in a letter to Foran. After Foran assured Somers that the reorganization was in the best interests of the court, Somers voiced his discontent to the SCAO. In a letter to SCAO Administrator Karl Gromek in April 2005, Somers shared his "honest conviction that [his] colleagues have allowed personal relationships to cloud their judgment in ways that cannot be allowed to go unchallenged." He asked that the SCAO "take action to reverse the intended appointment of Ms. Julie Pucci as court administrator," and remove Foran as the chief judge. He also requested that the anti-nepotism policy be revised so as "to include, specifically and explicitly, a prohibition of the hiring/retention of domestic partners," which would have made Pucci ineligible for continued employment in the Nineteenth District.

Believing that Pucci's promotion clashed with the "purpose" of the existing anti-nepotism policy, Gromek tried to reach a middle ground with Foran. Having failed to reach a compromise, Gromek sought the advice of the justices of the Michigan Supreme Court. Gromek then wrote Foran a letter, conveying a "directive" from the justices. The letter stated that Pucci could not be promoted to the Court Administrator role, but could remain in the Deputy position or in a lesser position. In response, Foran promoted Langen to Court Administrator and left Pucci as Deputy Court Administrator. The new executive secretary would assist them, and the Clerk of Court position would remain vacant. Foran confirmed this new arrangement with the SCAO, which did not object to the plan. Somers was "disappointed" with this outcome.

Somers began "lobbying" to become chief judge at the end of Foran's abbreviated term. The SCAO appointed him to that position in November 2005. Pucci, still not enjoying good relations with Somers, expected to be fired imminently.

Somers told the SCAO in the summer of 2006 that he planned to reorganize the Nineteenth District Court and was considering terminating Pucci's employment. He did so in October 2006. Pucci first heard of her termination when she found a memo from Somers in her mailbox. Although the memo did not mention Pucci by name, it stated that "[t]he position of [deputy] court administrator will . . . be eliminated effective November 15, 2006."

On the envelope, Somers wrote something to the effect of "if you want to discuss this or you have any questions, please let me know." Pucci immediately called Somers, who came to her office. Somers said that her termination was unrelated to her job performance. Pucci suggested various alternatives that would allow her to keep her job. She explained that she had "bumping rights" over Langen, and should therefore be able to take over as Clerk of Court, but Somers was unmoved. At the end of the conversation, Pucci reports that Somers indicated his

willingness to talk again but acknowledged that she would not be able to change his mind. Pucci and Somers had some brief exchanges via email about severance pay and related matters but did not otherwise discuss the termination any further. Attached to Somers's termination memo was a job posting for the Court Administrator position. Pucci submitted an application, but Somers eventually hired an outside candidate.

Pucci's termination was originally scheduled to be effective in mid-November 2006, but eventually took effect in December of that year.

B.

Pucci initially filed this lawsuit in the Eastern District of Michigan in February 2007, including as defendants the Nineteenth District Court and Somers in his individual and official capacities. She brought (1) a claim under 42 U.S.C. § 1983 for violation of her Fourteenth Amendment right to procedural due process; (2) a § 1983 claim for retaliation in violation of her First Amendment rights to free speech, free association, and free exercise; and (3) claims under the Elliott–Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2101 *et seq.*, for religious and sex discrimination.[1]

The defendants filed a motion for summary judgment on all claims. The district court granted the motion on the religious-discrimination claim. *Pucci v. Nineteenth Dist. Court*, 565 F. Supp. 2d 792, 811 (E.D. Mich. 2008). It also dismissed the portion of the § 1983 First Amendment claim asserting a violation Pucci's association and free-exercise rights. *Id.* Noting, however, that Pucci's claim was not "a model of clarity," the court ordered Pucci to clarify her

---

[1] She also brought claims for marital-status discrimination and retaliation under ELCRA, and a discrimination claim under the Whistleblowers' Protection Act, Mic. Comp. Laws § 15.361 *et seq.* The parties stipulated to the dismissal of all three of these claims. The parties also stipulated to the dismissal of all claims against the City of Dearborn. These claims are not relevant to this appeal and will not be discussed further.

claim, to the extent that it asserted a violation of Pucci's free-speech rights, in a Third Amended complaint. *Id.* at 808–09.

Turning to the remaining claims, the district court held that neither the Nineteenth District Court nor Somers (in his official capacity) were entitled to Eleventh Amendment immunity. *Pucci*, 565 F. Supp. 2d at 803–05. The district court also rejected Somers's claim of qualified immunity in his individual capacity. *Id.* at 810. On interlocutory appeal, we reversed the district court's Eleventh Amendment decisions, holding that both the Nineteenth District Court and Somers (in his official capacity) were entitled to immunity. *Pucci v. Nineteenth Dist. Court*, 628 F.3d 752, 764 (6th Cir. 2010). This court affirmed the district court's denial of qualified immunity. *Id.* at 767–69.

Pucci complied with the district court's order to clarify her First Amendment claim. She filed a § 1983 claim based exclusively on the violation of her right to free speech under the First and Fourteenth Amendments.[2] She filed this claim notwithstanding her lawyer's earlier email to opposing counsel, in which Pucci's lawyer stated that he "would dispense with filing a third amended complaint which simply included an additional count for free speech." At the time of the email, there appeared to be no evidence that Somers was aware of Pucci's complaints to the SCAO. After sending the email but before filing the Third Amended Complaint, Pucci obtained an affidavit stating that Somers was, in fact, aware of her complaints.

Three claims therefore proceeded to trial: the § 1983 claims alleging free-speech and procedural-due-process violations and the sex-discrimination claim under ELCRA. Somers, in his individual capacity, was the only remaining defendant. At a motions hearing two weeks before trial, the judge ruled that Somers could not raise the "reorganization exception" as a

---

[2] The defendants moved for summary judgment on the free-speech claim. The district court held that it lacked jurisdiction to adjudicate the motion because the defendants' interlocutory appeal was then pending.

defense to Pucci's due-process claim because he had waived the argument. Somers filed an emergency motion for reconsideration, and the court denied the motion.

Trial began before a jury on June 22, 2011. At the close of Pucci's evidence, the district court denied Somers's motion for judgment as a matter of law as to the § 1983 claims and took under advisement his motion for judgment as a matter of law on the sex-discrimination claim. Somers submitted a trial brief on the sex-discrimination claim and renewed his motion for judgment as a matter of law at the close of all evidence. The district court deferred judgment pending a verdict on the sex-discrimination count. Before submitting the case to the jury, the district court also denied Pucci's motion for judgment as a matter of law on the due-process claim.

The jury returned its verdict on June 30, 2011. It found in Pucci's favor on both the due-process and free-speech claims. It found in Somers's favor on the sex-discrimination claim. For the due-process and free-speech claims, the jury assessed compensatory damages of $434,361 for economic loss, and $100,000 for non-economic loss. The jury also found that Pucci was entitled to $100,000 in punitive damages for the due-process claim and a further $100,000 in punitive damages for the free-speech claim.

After the verdict, Somers moved to set aside the jury verdict on the free-speech claim on the basis that Pucci was not entitled to First Amendment protection because her employer's interests outweighed her interests under *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968). To assist the judge in the balancing under *Pickering*, the verdict form contained two supplemental questions. First: "Did the plaintiff's act of lodging a complaint about the defendant's use of religious references in the performance of his judicial duties cause, or could it have caused, disharmony in the workplace at the Nineteenth District Court?" The jury answered,

"Yes." The second question was: "Did the plaintiff's [complaints] impair the plaintiff's ability to perform her duties?" The jury answered, "No." The district court found that the balance weighed in Pucci's favor and therefore denied Somers's motion.

Pucci moved for attorney's fees. Using the "lodestar method," the district court held that a reasonable number of hours and a reasonable hourly fee yielded a lodestar of $397,000. The court then applied certain enhancements and found that these justified a five percent increase in the lodestar sum. Pucci was therefore awarded $416,850 in total attorney's fees. Somers filed a timely notice of appeal.

## II.

We first address Somers's challenges to several of the district court's rulings regarding Pucci's claim against him for retaliation under the First Amendment. To prevail on a retaliation claim, a plaintiff must prove that:

> 1) [She] engaged in protected conduct, 2) the defendant took an adverse action that would deter a person of ordinary firmness from continuing to engage in that conduct, and 3) the adverse action was taken at least in part because of the exercise of the protected conduct.

*Pucci*, 628 F.3d 752, 767 (6th Cir. 2010) (citing *Siggers–El v. Barlow,* 412 F.3d 693, 699 (6th Cir. 2005)). For a public employee's speech to be protected conduct, the employee must show "(1) that the speech at issue addresses a matter of public concern, and (2) that the employer had no overriding state interest in efficient public service that would be undermined by the speech." *Silberstein v. City of Dayton*, 440 F.3d 306, 318 (6th Cir. 2006) (citing *Pickering*, 391 U.S. at 568).

A.

Somers first claims that the district court erred in permitting Pucci to pursue her First Amendment retaliation claim. Somers points to an email from January 2008 in which Pucci's counsel stated that Pucci would not pursue a retaliation claim because the evidence obtained in discovery suggested that Somers did not know about Pucci's complaints to SCAO. Somers interprets this email as a judicial admission, arguing that "[s]tatements of an attorney that are directly related to the litigation at hand have been held to be within the attorney's scope of authority and binding on the client." *United States v. Johnson*, 752 F.2d 206, 211 (6th Cir. 1985).

The email does not preclude Pucci from proceeding on the retaliation claim.[3] First, Somers provides no authority for the view that a client should be bound by an informal, preliminary communication between counsel. "Judicial admissions are *formal* admissions," *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 829 (6th Cir. 2000) (emphasis added), which have been held to arise in the pleadings, stipulations, pretrial orders, and arguments at trial, *see id.*; *Kay v. Minacs Group (USA), Inc.*, 580 F. App'x 327, 331 (6th Cir. 2014); *cf. Lee v. Smith & Wesson Corp.*, 760 F.3d 523, 528 (6th Cir. 2014) (collecting cases and declining to extend the judicial-admissions doctrine to bind a party based on witness statements and trial).

Second, even if an informal pretrial communication could contain judicial admissions,[4] no admissions were made in the January 2008 email. "In order to qualify as judicial admissions, an attorney's statements must be deliberate, clear and unambiguous," and must be intentional waivers of a party's right to present evidence on a given issue. *MacDonald v. Gen. Motors*

---

[3] There is therefore no need to address Pucci's argument that Somers waived the ability to argue that the email constitutes a judicial admission.

[4] In *Fifth Third Bank v. Gulf Coast Farms, LLC*, 573 F. App'x 515, 521 n.3 (6th Cir. 2014), this court did not decide whether counsel's communications could constitute judicial admissions.

*Corp.*, 110 F.3d 337, 340 (6th Cir. 1997). If in doubt about the effect of counsel's statement, the court should allow the issue to proceed to the jury. *Id.* In the January 2008 email, Pucci's lawyer said that he "would dispense with filing" an amended complaint containing a retaliation claim because there was no evidence that Somers had notice of Pucci's complaints. But the email does not show that Pucci intended to abandon the right to raise a retaliation claim in the future. Subsequent evidence indicated that Somers did in fact know of Pucci's complaints to the SCAO, and Pucci therefore added a retaliation claim. There is no suggestion—and certainly not a clear and unambiguous statement—that the January 2008 email was a deliberate waiver of her right to pursue the First Amendment retaliation claim.

B.

Somers next argues that the district court erred in failing to grant Somers's Rule 50(a) motion for judgment as a matter of law at the close of Pucci's evidence. This court reviews *de novo* the district court's denial of a motion for judgment as a matter of law. *See Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l., Inc.*, 730 F.3d 494, 502–03 (6th Cir. 2013). Judgment as a matter of law is appropriate if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). "'[T]he court is to review all evidence and draw all reasonable inferences in the light most favorable to the non-moving party, without making credibility determinations or weighing the evidence.'" *Watts v. United Parcel Serv., Inc.*, 701 F.3d 188, 190–91 (6th Cir. 2012) (quoting *Jackson v. FedEx Corporate Servs., Inc.*, 518 F.3d 388, 392 (6th Cir. 2008)). "'District courts should grant judgment as a matter of law only if a complete absence of proof exists on a material issue in the action, or if no disputed issue of fact exists on which reasonable minds could differ.'" *Karam v.*

*Sagemark Consulting, Inc.,* 383 F.3d 421, 427 (6th Cir. 2004) (quoting *LaPerriere v. Int'l Union UAW,* 348 F.3d 127, 132 (6th Cir. 2003)).

Somers claims that the district court should have granted judgment as a matter of law on the basis that Pucci was speaking as an employee—not as a citizen—when she complained to the SCAO. The distinction is important because, as we explained the last time we addressed this case:

> [T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern. But when public employees speak pursuant to their official duties rather than as citizens, the Constitution does not insulate their communications from employer discipline.

*Pucci*, 628 F.3d at 768 (citing *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006); *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 546 (6th Cir. 2007)). Somers argues that Pucci—speaking as an employee—was not entitled to First Amendment protection and that the district court should have granted judgment as a matter of law in his favor.

We disagree. There was ample evidence at trial from which a reasonable jury could have concluded that Pucci was speaking as a citizen on a matter of public concern. "To establish whether a public employee is speaking as a citizen, we look to numerous indicia establishing the scope of the employee's professional duties, including ad hoc or de facto duties . . . within the scope of an employee's official responsibilities . . . ." *Pucci*, 628 F.3d at 768 (internal citations and quotation marks omitted) (citing *Garcetti*, 547 U.S. at 425; *Weisbarth*, 499 F.3d at 544).

Pucci's testimony on direct included the following exchange:

> Q. Okay. Let's talk about your contacts with SCAO.
> A. Okay.
> Q. At some point in time, did you become aware that Judge Somers was using religion from the bench?
> A. Yes, I was.
> Q. How did you become aware of that?

A. The first time I became aware of it was, a jury clerk had given me a letter that Judge Somers had sent to a – I believe it was a potential juror and it had a biblical passage on the bottom.
. . .
Q. Exhibit 9 is the letter you're referring to?
A. Yes, it is.
Q. And is there a biblical passage on the bottom of that letter?
A. Yes.
Q. What about that biblical passage disturbed you?
A. I think what disturbed me the most is that it was on letterhead. The letterhead is paid from the City of Dearborn. A biblical passage does not belong on any type of a court correspondence. I was offended by it.
Q. As an employee of the court or as a citizen of the United States?
A. I mean, no, my job isn't to critique judges. We have got people in place for that. But as a person, as an individual, as a citizen, I was – I was offended.

This short exchange, in itself, provides sufficient evidence for a reasonable jury to conclude that Pucci was acting outside of the scope of her official responsibilities in complaining to the SCAO and was simply complaining as a citizen. This would also be consistent with the rest of Pucci's testimony, which portrays her role at the court as administrative, and lacking in any supervisory or reporting power over the judges. Viewing all of this evidence in the light most favorable to Pucci, it establishes that the complaint fell outside of her professional duties, including her *ad hoc* or *de facto* duties.

Although Pucci's testimony was sufficient in itself, it was bolstered by other evidence. Hultgren, according to his testimony, told Somers: "[Y]our biblical sayings on your letterhead and your religious ramblings in the courtroom . . . are things that *any citizen* should be outraged at." This suggests that personal feelings—not professional responsibility—may legitimately have motivated Pucci's conversations with the SCAO, as any citizen could have been motivated to complain after witnessing Somers's conduct. Sharon Langen, the Clerk of Court, also complained to the SCAO about Somers's letter to the juror. She made clear that her objection,

also, was in her capacity as a citizen and unrelated to her administrative position at the court. Viewing all of this evidence in the light most favorable to Pucci, a reasonable jury could have undoubtedly concluded that her complaint fell outside of her official duties.

Somers argues that, even if Pucci acted outside of her official duties when she contacted the SCAO to complain, she acted within the scope of those duties when she opined that Somers would not be a good chief judge. But the evidence of Pucci's conversations with the SCAO about Somers's candidacy for chief judge is very limited and does not change our conclusion that a reasonable jury could still find Pucci was speaking as a citizen. When pressed on the details of her conversations with Pucci, Jan Hunt-Kost—an analyst at SCAO—remembered very little. Hunt-Kost explained, "If you're asking me to remember specific conversations, I have lots of conversations with lots of court administrators . . . we over a long period of time discussed a number of issues . . . ." Pucci's memory was slightly clearer, and she acknowledged that Hunt-Kost called her to ask her opinion on Somers becoming chief judge. But the evidence certainly would not require a reasonable jury to conclude that Pucci's official duties included offering advice on candidates for chief judge. A reasonable jury could just as easily view this as part of a continuing line of informal conversations that—though shared between employees—were not within the employees' official roles. The district court did not err in denying Somers's motion for judgment as a matter of law.

## C.

Somers next challenges the district court's denial of his renewed motion for judgment as a matter of law based on the *Pickering* test. We review *de novo* the district court's denial of a motion for judgment as a matter of law. *Miami Valley Fair Housing Center, Inc. v. Connor*

*Group*, 725 F.3d 571, 577 (6th Cir. 2013). The district court did not err in its denial of the motion, so we affirm.

Although Pucci spoke as a citizen on a matter of public concern, she was still only entitled to prevail on her First Amendment retaliation claim if her "free speech interest outweigh[ed] the efficiency interests of the government as employer." *Scarborough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006) (internal quotation marks omitted) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 574 (1968)). "[A] state is afforded greater leeway to control speech that threatens to undermine the state's ability to perform its legitimate functions." *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003). To balance the interests of the employee and the government:

> [The court] should consider whether an employee's comments meaningfully interfere with the performance of her duties, undermine a legitimate goal or mission of the employer, create disharmony among co-workers, impair discipline by superiors, or destroy the relationship of loyalty and trust required of confidential employees. Relevant factors in this regard include the manner, time, and place of the employee's expression, as well as "the context in which the dispute arose. Defendant bears the burden of demonstrating that legitimate grounds existed justifying the termination.

*Id.* (internal citations and quotation marks omitted) (quoting *Rankin v. McPherson*, 483 U.S. 378, 388 (1987); *Williams v. Kentucky*, 24 F.3d 1526, 1536 (6th Cir. 1994)). "[I]f an employee's speech substantially involve[s] matters of public concern, an employer may be required to make a particularly strong showing that the employee's speech interfered with workplace functioning before taking action." *Leary v. Daeschner*, 228 F.3d 729, 737–38 (6th Cir. 2000) (internal quotation marks omitted).

The question of whether an employee's speech is protected under *Pickering* is one of law. *Dixon v. Univ. of Toledo*, 702 F.3d 269, 274 (6th Cir. 2012). The jury may, however, resolve

some underlying factual questions, which can inform the legal determination of the *Pickering* balancing. *See, e.g., Donlin v. Watkins*, 814 F.2d 273, 277 (6th Cir. 1987) (acknowledging that factual questions may inform the court's decision); *see also Washington v. Normandy Fire Prot. Dist.,* 328 F.3d 400, 404 (8th Cir. 2003) (approving the use of special interrogatories or special verdict forms to resolve factual questions underlying the *Pickering* balancing); *Shands v. City of Kennett*, 993 F.2d 1337, 1342–43 (8th Cir. 1993) (citing the question of whether the plaintiff's speech created disharmony in the workplace as an issue that the jury could properly resolve).  At trial, both parties consented to the jury instructions, which included the special interrogatories.

The jury found that Pucci's complaints to the SCAO caused, or could have caused, disharmony in the workplace.  But the jury also found that the complaints did not impair Pucci's ability to perform her duties.

Pucci's free-speech interest in this case outweighed Somers's interest in the efficient operation of the Nineteenth District Court.  She had a strong interest—as a citizen—in alerting the SCAO to Somers's conduct on the bench, which "implicates the propriety and legality of public, in-court judicial conduct . . . ."  *Pucci*, 628 F.3d at 768.  Her speech is entitled to significant weight because, as this court has long recognized, "'[p]ublic interest is near its zenith when ensuring that public organizations are being operated in accordance with the law.'"  *Id.* (quoting *Marohnic v. Walker*, 800 F.2d 613, 616 (6th Cir. 1986)); *see also Williams*, 24 F.3d at 1537 ("'[W]hen an employee exposes unscrupulous behavior in the workplace, his interests are co-extensive with those of his employer; both want the organization to function in a proper manner.'" (quoting *Marohnic*, 800 F.2d at 616)).

Although Pucci spoke with representatives of the SCAO on several occasions, the jury found that her activities—and her feelings about Somers's conduct—did not impair her job

performance. Moreover, she did not go further than necessary to make her views heard. *See Rodgers*, 344 F.3d at 587 (noting, in conducting the *Pickering* balancing, that the plaintiff's speech was not "particularly inflammatory," did not contain "abusive language," and had no "exceptionally insulting aspect"). Pucci's complaints caused disharmony, as was perhaps to be expected in the circumstances. Rarely will a workplace atmosphere remain completely undisturbed after an employee reports a superior to a regulatory authority. But Pucci did not contribute to the tension beyond making the complaints. Much of the disharmony stemmed from the erosion in the relationship between Somers and Hultgren, which was not solely attributable to Pucci's complaints. It may not have been attributable to the complaints at all; Somers claimed at trial that he was not even aware of the complaints before he terminated Pucci.

In addition, while the disharmony manifested itself in low morale in the courthouse, there is no evidence that the disharmony meaningfully interfered with the court's public operations. There is no evidence that Pucci's complaints caused tasks to go undone, work quality to lapse, or the public confidence in the state judiciary to wane. Thus, while Pucci spoke on a matter of real importance, her speech had only "the relatively minor associated risk of disharmony." *Rodgers*, 344 F.3d at 602.

Somers urges the panel to assign special weight to a courthouse's interest in efficiency. He correctly notes that the balancing of interests is context-dependent, and that that disruption in a courthouse could have serious consequences. He also cites cases in which this court has held that a public employer's interest in an important public function outweighed the employee's free-speech interest. But unlike those cases, Pucci's complaints caused mere disharmony, not actual impairment of the entity's public functions.

In *Guercio v. Brody*, 911 F.2d 1179 (6th Cir. 1990), an administrative employee disclosed corruption by bankruptcy judges, one of whom then resigned. *Id.* at 1181. The employee then circulated "to the press and others" newspaper articles reporting that a nominee for the vacant bankruptcy judge position had previously represented reputed organized crime figures. *Id.* The nominee was confirmed, and dismissed the employee upon arrival. *Id.* This court applied the *Pickering* test and held that the free-speech interest of a judicial employee "was outweighed by the public interest in restoring morale, cooperation, dignity, public respect, and confidence to . . . a court which had been corroded by corruption and favoritism." *Id.* at 1185. Somers also cites *Fitzpatrick v. City of Frankfort*, 305 F. App'x 258 (6th Cir. 2008), which held that a fire department's interest in maintaining efficiency and discipline outweighed the free-speech interest of an employee who exhibited "a generally antagonistic and uncooperative attitude," and whose written "call to arms" against his supervisors resulted in "dissension" and "impairment of discipline." *Id.* at 259, 264–65. Finally, Somers refers to *Graham v. City of Mentor*, 118 F. App'x 27 (6th Cir. 2004). There, a police department's interest outweighed that of officers whose conduct included conducting a critical media campaign against their supervisors, "inappropriately" obtaining documents to aid the campaign, and harassing a local business owner into supporting the police union. *Id.* at 28–29. The officers behaved in a manner "clearly intended to create division among the officers" in the department. *Id.* at 30.

Somers relies on cases that feature intentional and extreme employee conduct that caused disruption in the actual functioning of important entities. They also involve speech to the public and media that threatens the public perception of the agencies and individuals involved. By contrast, Pucci's speech led to mere disharmony, and did not reach beyond the SCAO, the appropriate channel for complaints about judicial misconduct. "[I]t is impermissible to allow a

superior to terminate an employee simply because tensions that did not impede the functions of the workplace arose over such protected speech." *Murphy v. Cockrell*, 505 F.3d 446, 453 (6th Cir. 2007).

Pucci's interest in free speech outweighed Somers's interest in the efficiency of the Nineteenth District Court. The district court did not err in denying Somers's renewed motion for judgment as a matter of law.

### III.

Pucci also won a judgment against Somers for denial of her right to due process. In order to prevail on a procedural due process claim, a public employee "must first establish that he had a protectable property interest in his position . . . ." *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 620 (6th Cir. 2013) (citing *Miller v. Admin. Office of the Courts*, 448 F.3d 887, 895 (6th Cir. 2006)). If so, the employee must demonstrate that he was not "afforded the procedures to which government employees with a property interest in their jobs are ordinarily entitled." *Id.*

Somers does not dispute that Pucci had a property right in her employment with the Nineteenth District Court. He argues first that Pucci was not entitled to pre-termination process because Somers eliminated her position pursuant to an administrative reorganization. He next contends that, even if Pucci was entitled to pre-termination process, she received all of the process she was due.

### A.

Somers challenges the district court's ruling that Somers had waived the "reorganization exception," and thus could not argue it at trial. The court's ruling prevented Somers from arguing at trial that Pucci was not entitled to any pre-termination process on the basis that her

termination was due to an administrative reorganization rather than her individual job performance.

When a state employee has a constitutionally protected property interest in her employment, the Fourteenth Amendment requires notice and "some kind of a hearing" prior to the employee's discharge. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 569–70 (1972)); *see also Kuhn*, 709 F.3d at 620. However, Somers argues that this kind of process was not constitutionally required because the termination was based on a reorganization and not on Pucci's individual characteristics or job performance. This is the kind of argument that the First Circuit described in *Whalen v. Mass. Trial Court*, 397 F.3d 19, 25 (1st Cir. 2005): no pre-termination process is due when the termination is "in good faith directed at positions rather than individuals." *Id.*

The district court prohibited this line of argument because, in its view, Somers waived the argument by failing to raise it on summary judgment. We affirm because the district court's error, if any, was harmless.

We reverse based on a district court's error only if that error "affected the outcome of the trial." *Burley v. Gagacki*, 729 F.3d 610, 621 (6th Cir. 2013) (internal quotation marks omitted); *see also Gover v. Perry*, 698 F.3d 295, 299–300 (6th Cir. 2012) (holding that the court may consider harmlessness *sua sponte*). In determining whether the alleged error affected the outcome, the court can be guided by any untainted findings that the jury has already rendered. *See, e.g.*, *Lancer Ins. Co. v. D.W. Ferguson & Assocs.*, 46 F.3d 1142, 1995 WL 21705, at *4 (9th Cir. 1995) (unpublished table disposition) ("If the jury found malice to support punitive damages, it would have found malice to refute the common interest privilege if asked."); *Smith v. Walter C. Best, Inc.*, 927 F.2d 736, 739 (3d Cir. 1990) (holding that the district court's failure to

instruct the jury on a valid claim was harmless because the jury's verdict on a separate claim demonstrated that the plaintiff would not have prevailed on the omitted claim).

Here, Somers raises a plausible claim that the district court erred in finding that Somers waived his argument. His argument was not an affirmative defense that he was required to raise in his answer. *See* Fed R. Civ. P. 8(c), 12(h). And Somers did discuss reorganization as a theme—going to his motive for terminating Pucci—from an early stage in the litigation.

However, even assuming that the district court erred in its ruling on waiver, the ruling did not prejudice Somers. First, recognizing the reorganization defense—in the way Somers presents it—would go beyond the precedents of this court and most other courts. Second, Somers's argument for prejudice is that the jury did not have the opportunity to consider, in the due process context, his motive for terminating Pucci. The jury's verdict makes clear that it would not have found in Somers's favor on this issue in any event.

We first examine the cases that may potentially support Somers's purported reorganization defense. Somers bases his argument on *Upshaw v. Metropolitan Nashville Airport Authority*, 207 F. App'x 516 (6th Cir. 2006). But the *Upshaw* court interpreted the terms of the specific civil-service personnel plan under which the plaintiff was employed. Under that plan, a creature of state law, the court held that "the nature of the specific property right that [the plaintiff] enjoyed in his position did not extend to protection from elimination of his position in the context of a reorganization." *Id.* at 519. The case did not decide that there is any general reorganization defense to a due process claim and we see no reason to extend the principle in today's opinion.

Other authorities on reorganization in the due process context are similarly unavailing. Both *Goldsmith v. Mayor & City Council of Balt.*, 845 F.2d 61 (4th Cir. 1988), and *Shulz v.*

*Green Cnty.*, 645 F.3d 949 (7th Cir. 2011), deal with reorganizations carried out by legislative bodies rather than individual decision makers. As the *Goldsmith* court explained, "under the federal constitution, a legislative body, including municipal councils, has the unfettered authority to create, alter, and abolish such positions." *Goldsmith*, 845 F.2d at 65. This says nothing about the non-legislative reorganization to which Somers refers in the present case. Recognizing a general reorganization in this context would not only take us beyond our own precedents, but also beyond the precedents of most other courts.

There is also a second reason for our decision that Somers suffered no prejudice as a result of the district court's ruling on waiver: even if the district court had applied the type of general reorganization exception to due process for which Somers advocates, he still would not have prevailed.

Even where the reorganization exception is recognized, the mere existence of an administrative reorganization does not always displace the need for pre-termination process. The employee may argue that the reorganization is a pretext, or "sham." *Upshaw*, 207 F. App'x at 520; *Whalen*, 397 F.3d at 25 n.5. In other words, the employee may allege that the termination of a single employee must be the goal, rather than the byproduct, of the reorganization. If the fact-finder finds that the employer's decision to reorganize was indeed a pretext, *Loudermill*'s pre-termination requirements apply. *See Upshaw*, 207 F. App'x at 520.

A key issue in applying the reorganization exception is therefore, in essence, a question of the employer's motive: Was the employee terminated because of the reorganization, or was the reorganization conducted in order to terminate the employee? In the case at hand, the jury has already answered that question. It has considered and rejected the view that the reorganization was Somers's motive for terminating Pucci.

The district court did not allow Somers to argue that the reorganization exception applied in the due process context. But the court did "allow[] Somers to present evidence at trial of reorganization as motivation for actions taken." Somers took full advantage of this opportunity. His attorney's opening statement forewarned the jury that evidence of a reorganization of the Nineteenth District Court would absolve Somers of liability under "all three" claims: the First Amendment retaliation claim, the due process claim, and the discrimination. The dismissal, the lawyer said, was part of "a legitimate reorganization in the best interest of the court."

Somers's team relied throughout the trial on reorganization as a basis for Pucci's dismissal. During Pucci's evidence, Somers sought to turn the jury's attention to the reorganization theme. For example, in cross-examining the city's Human Resources Analyst, defense counsel asked both about Pucci's new job within the government and about previous reorganizations. Later, counsel asked the Analyst about a "reorganization memo" that Pucci received. Defense counsel asked Judge Hultgren, on cross-examination, about his reaction to "Judge Somers's reorganization plan." In arguing for judgment as a matter of law on all three claims, Somers's lawyer claimed that "there [was] a legitimate reason for [Somers] to do what he was going to do anyway . . . the indication is that this was a reorganization." Reorganization was also central to Somers's own evidence. Counsel asked a regional director at the SCAO about Judge Somers's plans to "reorganize the court" and the reasons for doing that. Somers's team returned to the issue on redirect, asking the director whether Somers's decision about Pucci's position "was about streamlining the court." Somers then took the stand and personally discussed his reorganization plan. Finally, in closing arguments, his attorney repeatedly pressed the reorganization theme. Throughout the trial, Somers therefore leaned heavily on the notion that reorganization was his motive for terminating Pucci.

The jury addressed the motive issue in reaching a verdict on Pucci's First Amendment retaliation claim. The jury instructions made clear that the jury could only find in Pucci's favor on the retaliation claim if Pucci proved that Somers's "motive, intent, or design" was to retaliate based on her complaints to the SCAO. In other words, the jury had to find that the complaints to the SCAO formed "at least part of the Defendant's reason for taking . . . the adverse action against Pucci."

The jury was asked to decide among a small number of potential motives. The district court summarized the motive issue when he denied Somers's motion for judgment as a matter of law at the close of Pucci's evidence:

> The question . . . that really is presented to the jury by this count is whether or not the change was made for one of three reasons; that is, there was a legitimate need to reorganize the court for whatever purpose the Chief Judge had in mind at the time, or the action was taken in retaliation because of the relationship between Hultgren and the Plaintiff, or there was retaliation because of the complaint that the Plaintiff made . . . regarding the Defendant's practices on the bench.

As a result, when the jury decided the retaliation claim in Pucci's favor, it must necessarily have decided that retaliating against Pucci for her complaints to the SCAO formed at least part of Somers's motive. In order to do so, the jury must have rejected the view that reorganization alone motivated the termination. The jury found that Somers's focus was not purely on the reorganization of the court, but on Pucci as an individual. Thus, even if the reorganization exception applied, he would have been unable to show that pre-termination process was unnecessary.

Assuming that the district court erred in preventing Somers from presenting the reorganization exception, the error was harmless.

B.

Somers next claims that, even if Pucci was entitled to notice and a hearing, Somers fulfilled his procedural requirements as an employer. He therefore contends that the district court erred in denying Somers's motion for judgment as a matter of law on the due process claim at the close of Pucci's evidence. Again, we review *de novo* the district court's denial of the motion for judgment as a matter of law, *Groeneveld*, 730 F.3d at 502–03, and consider whether—granting all inferences in the non-moving party's favor—there was a legally sufficient basis for a reasonable jury to find for the non-movant. *See* Fed. R. Civ. P. 50(a)(1); *Watts*, 701 F.3d at 190–91.

A public employee with a property right in her employment must receive a pre-termination hearing. *Loudermill*, 470 U.S. at 542–46. Although the hearing "need not be elaborate," *id.*, the employee is entitled to "'oral or written notice of the charges against him or her, an explanation of the employer's evidence, and an opportunity to present his or her side of the story to the employer.'" *Farhat v. Jopke*, 370 F.3d 580, 595 (6th Cir. 2004) (quoting *Buckner v. City of Highland Park*, 901 F.2d 491, 494 (6th Cir. 1990)). This process is designed "to invoke the employer's discretion, his sense of fairness and mutual respect, his willingness to reconsider." *Duchesne v. Williams*, 849 F.2d 1004, 1008 (6th Cir. 1988) (internal quotation marks omitted). In some circumstances, an abbreviated pre-termination process will be sufficient if coupled with the opportunity for a post-termination, adjudicatory hearing before a neutral decision maker. *Farhat*, 370 F.3d at 595–96; *see also Duchesne*, 849 F.2d at 1008. But the post-termination caveat "applies only where the deprivation complained of is random and unpredictable, such that the state cannot feasibly provide a pre-deprivation hearing." *Silberstein v. City of Dayton*, 440 F.3d 306, 315 (6th Cir. 2006).

By the close of Pucci's evidence, there was sufficient evidence for a reasonable jury to conclude that Somers did not give Pucci timely and adequate process. Pucci's testimony on direct examination included the following exchange:

> Q. . . . Now, eventually you get fired, correct?
> A. Yes.
> Q. And first, how did you learn that you had been fired?
> A. He put a memo in my mailbox.
> Q. Had other people learned about your discharge before you?
> A. Yes.
> Q. Who had learned about your discharge before you?
> A. Sharon Langen. He shared it with his personal staff. And obviously, there were, I think, three other -- three or four other people cc'ed on that memo.
> Q. Did Sharon Langen give you a heads up?
> A. No.
> . . .
> Q. . . . And tell me about [the] conversation [with Somers].
> A. Well, if I remember correctly, I think he had something written on the outside of the envelope, call me if you want to talk, or something like that, if you had any questions.
>
> Well, I had several questions. And I had called him and he came down to my office. And as he is walking in my office, the first thing he says is, "You have no idea what's going on in my life and how bad things are," as he just fired me.
>
> And I said to him, something to the effect, "You never said you were dissatisfied with my job, ever."
>
> And he says, "I'm not. You're a great employee. This isn't about that."
>
> I said, "What is it about?"
> He said, "I need a Court Administrator."
> And I said, "You have one."
> And he said, "Sharon is not a Court Administrator."
> And then I said something to the effect, "Well, I would have been the Court Administrator had you not written all your letters."
>
> And he said, "Well, you can't be Court Administrator because of your relationship with Judge Hultgren, and therefore, I'm eliminating your position."
>
> So I said, I said something to the effect, "Well, what about the Clerk of the Court position?"
>
> You know, I had more seniority than Sharon. I have a college degree. I did the job.
> And he said, "No."

So I said, "So basically, what you're saying is that you're terminating me based upon my relationship with Judge Hultgren, not my job performance?["]
And he said, "Yes."
Q. And that was the extent of the – of the meeting?
A. Then he got up and he said something like, "If you want to talk any more, let me know."
And I said, "Will it change anything?"
And he said, "No." And he walked out of my office.

Viewing this evidence in the light most favorable to Pucci, a reasonable jury could have found that Pucci's termination was not the subject of a meaningful hearing at which she was able to invoke Somers's discretion. By the time Pucci could request a meeting, a reasonable jury could have determined, Somers had already made his final decision. Indeed, he had already communicated that final decision to Pucci and other court personnel in his memo of October 10, 2006, which Pucci introduced during the testimony of her first witness. His memo began with the words: "After careful consideration, it has been decided . . . ."

Given that there was sufficient evidence for the jury to find in Pucci's favor on this issue, the district court did not err in denying Somers's motion for judgment as a matter of law.

IV.

Finally, Somers challenges the award of attorney's fees. He argues that the district court erred both in its calculation of the lodestar and in its application of enhancements to the lodestar. We review for abuse of discretion, giving "substantial deference" to the district court's award. *Garner v. Cuyahoga Cnty. Juvenile Court*, 554 F.3d 624, 634 (6th Cir. 2009). We find no abuse of discretion in either the district court's lodestar calculation or its application of enhancements. We therefore affirm.

V.

For the above reasons, we affirm.